(No. 80341.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GORDON "RANDY" STEIDL, Appellant.

*Opinion filed September 18, 1997.*

Michael B. Metnick and Kathryn Saltmarsh, of Metnick, Wise, Cherry & Frazier, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield (Barbara E. Preiner, Solicitor General, and Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant, Gordon "Randy" Steidl, and codefendant, Herbert Whitlock, were indicted for the murders of Dyke and Karen Rhoads. Defendant's case was severed from Whitlock's. Following a jury trial, defendant was found guilty of both murders. The jury found defendant

eligible for the death penalty and that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death and his sentence and conviction were upheld by this court on direct appeal. *People v. Steidl*, 142 Ill. 2d 204 (1991).

Defendant subsequently filed a petition for post-judgment relief under section 2—1401 of the Civil Practice Law (735 ILCS 5/2—1401 (West 1994)) based on recantations of testimony by two key State witnesses. The section 2—1401 petition was denied when the witnesses withdrew their recantations at the hearing. Plaintiff then filed a petition under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994)). The petition was later amended. During the proceedings on the amended post-conviction petition, defendant filed three motions for substitution of judge. All three motions were denied, and the court subsequently dismissed the post-conviction petition without an evidentiary hearing.

Defendant now appeals the denial of his amended post-conviction petition without an evidentiary hearing, arguing that he has presented substantial evidence to establish that he received ineffective assistance of counsel at trial and at the sentencing hearing. He further contends that the trial court erred when it denied his motions for substitution of judge. For the reasons detailed below, we reverse and remand for an evidentiary hearing on defendant's post-conviction petition in front of a newly substituted judge.

## BACKGROUND

At 4:39 a.m. on July 6, 1986, firefighters responded to the report of a fire at a house in Paris, Illinois. The firefighters found that the fire had been set in two separate locations in the home. Although the fire had destroyed much of the downstairs area, the upstairs had received mostly smoke damage. The firefighters discov-

ered the naked bodies of Dyke and Karen Rhoads in an upstairs bedroom. Dyke was lying on the floor near the bedroom door and had been stabbed 28 times. His fatal wound was below the left armpit and was six inches deep. Karen was on the floor near the foot of the bed with a pillow covering her face, and had been stabbed 26 times. She had two possibly fatal wounds, one under her right armpit, the other in her chest. The former was also six inches deep. None of the physical evidence found at the scene was linked to the defendant.

The State offered two key witnesses at trial, Deborah Rienbolt and Darrell Herrington. Rienbolt testified that she was a drug addict and an alcoholic, and that she knew defendant and Whitlock from around town and from drug dealing. Rienbolt testified that approximately one month before the murders she had heard defendant and Whitlock talking to Dyke Rhoads about drug deals and that she had accompanied Whitlock to the Rhoads house a few times. During the visits, Rienbolt remained outside while Whitlock spoke to Dyke Rhoads about drugs.

Rienbolt further testified that on the morning of July 5, 1986, she was at a bar called Jeanie's Place, where she overheard a conversation between Whitlock and Dyke Rhoads. Dyke wanted out of a drug deal and gave Whitlock some money toward this end. Whitlock told Dyke that it was not that easy to get out. That afternoon Rienbolt decided not to go to work. She either had a coworker punch her in or punched herself in and then left. Rienbolt then borrowed a car from a friend and drove to the house of another friend, Barbara Furry. She and Furry smoked marijuana. Around 8:30 that evening, Rienbolt went to a local bar called the Tap Room, where she encountered the defendant, Whitlock, Herrington, and an unidentified man.

Rienbolt further testified that, later that night, she

went to the American Legion, possibly with Barbara Furry, but stayed outside until closing time at midnight. At closing, defendant, Whitlock, Herrington, and the unidentified man exited the Legion. Whitlock approached Rienbolt and asked her for a hunting knife that belonged to her husband, which she had brought with her in response to Whitlock's earlier requests for the knife. Rienbolt gave Whitlock the knife. Whitlock told her that he had some business to take care of, mentioning Dyke Rhoads and drug deals. Rienbolt then proceeded alone to the Rhoads residence, where she observed defendant's car parked next to the house. She entered the house through the back door and went upstairs to a bedroom. Upon entering the bedroom, she noticed a broken lamp in the room, a piece of which somebody was holding. Dyke and Karen Rhoads were in the bedroom, as were defendant and Whitlock. Defendant and Whitlock stopped Dyke Rhoads as he stumbled to the doorway. Defendant and Whitlock began stabbing Dyke with the knife Rienbolt had given Whitlock. Meanwhile Rienbolt held Karen down. She continued to hold Karen as defendant and Whitlock stabbed Karen. Rienbolt testified that everything "got real fuzzy at that point," but she did remember the position of the bodies in the room. She also recalled a fire. Rienbolt testified that Whitlock returned her knife later that morning and that she cleaned it by soaking it in hot water and picking the blood out of the crevices. A subsequent forensic examination of the knife revealed no traces of blood, although animal hairs were found.

In February 1987, Rienbolt made the first of several statements to the police. The events surrounding the murders in Rienbolt's statements varied, but she admitted more involvement in the murders with each successive statement. In April 1987, Rienbolt entered into a plea agreement whereby she pled guilty to concealment

of a homicidal death in exchange for a five-year prison sentence.

Herrington testified that he was an alcoholic and that on July 5, 1986, he drank continuously from noon until midnight. He testified that he was with defendant and Whitlock at the Tap Room and the American Legion the evening of July 5. When the American Legion closed, he asked defendant for a ride home. Defendant agreed, but drove with him and Whitlock to the Rhoads house first. Herrington slept in the car while defendant and Whitlock went inside the house. Herrington was awakened by a sound and used a credit card to open the locked back door. He heard a woman scream, and inside the house he encountered defendant holding a knife. Herrington left the house. Whitlock later came outside and drove off. Herrington went back inside the house, going upstairs into the bedroom. There he observed the bodies of Dyke and Karen Rhoads. Herrington picked up a pillow and threw it on Karen's face. Defendant told Herrington that he would suffer the same fate if he told anyone what had happened. Soon thereafter Whitlock returned with gallon jugs. Defendant threatened Herrington again and told him to leave. Herrington then ran for home. He testified that he saw no one other than himself, defendant, Whitlock, and the victims at the Rhoads residence.

Defendant testified that at about 9:30 p.m. on July 5 he was at the Barn Tavern with Nanette Klein, Christy Ferris, and Dennis Ouzleman. Around 10:30 p.m. he left the Barn Tavern and went to the American Legion by himself. At approximately 12:15 a.m. he left the American Legion alone, dropped his car off at his apartment, and walked to the Horseshoe Tavern, where he met up with Klein, Ferris, and Ouzleman. After about 15 minutes, at around 12:50 a.m., the group left and returned to Ouzleman's apartment, which was in the

same building as defendant's apartment. The four then smoked some marijuana. Defendant and Ferris subsequently returned to defendant's apartment, where they both remained until approximately 3 a.m., at which time defendant left to mail his unemployment forms to insure the timely arrival of his unemployment check. On his way out, defendant encountered Klein in the yard and told her what he was doing. When defendant returned to the apartment about five minutes later, Klein and Ferris left. Defendant went to bed and slept until 11:30 that morning.

## ANALYSIS

A proceeding brought under the Post-Conviction Act is a collateral attack on a judgment of conviction. The inquiry in a post-conviction petition is limited to allegations of constitutional violations that were not and could not have been raised previously. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). The petitioner is entitled to an evidentiary hearing only upon making a substantial showing that he suffered a substantial deprivation of constitutional rights. *People v. Coleman*, 168 Ill. 2d 509, 537 (1995). In making that determination, all well-pleaded facts in the petition and any accompanying affidavits are taken as true. *People v. Caballero*, 126 Ill. 2d 248, 259 (1989). The determinations of the trial court, however, will not be disturbed absent manifest error. *People v. Franklin*, 167 Ill. 2d 1, 9 (1995).

### Ineffective Assistance of Counsel

Defendant's claims of ineffective assistance of counsel fall into two general areas: (1) failure to conduct an investigation and to impeach the State's key witness at trial; and (2) failure to prepare and present evidence in mitigation at the sentencing hearing. Defendant maintains that the cumulative effect of these errors constituted ineffective assistance of counsel.

To establish a claim of ineffective assistance of counsel, defendant must show both that counsel's performance was deficient and that he was substantially prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). An attorney is required to provide reasonable assistance within the range of prevailing professional norms. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65; *Caballero*, 126 Ill. 2d at 260. The court, however, must indulge in a strong presumption that counsel's performance was competent and that all decisions were made while exercising reasonable professional judgment. *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Thompkins*, 161 Ill. 2d 148, 161 (1994). Additionally, even if an attorney's performance was incompetent, a defendant must still establish that he was prejudiced by the attorney's errors such that there exists a reasonable probability that, but for the counsel's deficient performance, the fact finder would have entertained reasonable doubt as to the defendant's guilt. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69; *Caballero*, 126 Ill. 2d at 260.

At the outset we note that in a post-conviction petition, issues that were raised and decided on direct appeal are barred by the doctrine of *res judicata*, and any claim that could have been presented on direct appeal but was not is deemed waived. *People v. Thompkins*, 161 Ill. 2d at 157-58; *People v. Del Vecchio*, 129 Ill. 2d 265, 275 (1989). The doctrines of *res judicata* and waiver are relaxed, however, if fundamental fairness so requires. *Thompkins*, 161 Ill. 2d at 158. Defendant contends that the evidence contained in his post-conviction petition is newly discovered and the doctrines of *res judicata* and waiver do not apply. Generally, claims of ineffective assistance of counsel are waived if they are not raised on

direct appeal. *People v. Orange*, 168 Ill. 2d 138, 149 (1995). Where facts relating to the competency of counsel are not in the record or are newly discovered, however, the waiver rule is relaxed. *Orange*, 168 Ill. 2d at 149. Except where noted below, defendant's post-conviction petition presents new arguments or new evidence not considered on direct appeal and will therefore be considered.

### Ineffective Assistance at Trial

Defendant asserts that his trial attorney, S. John Muller, rendered ineffective assistance in failing to conduct an investigation of the crime scene, failing to locate and subpoena crucial witnesses, and failing to properly impeach Rienbolt at trial. Consequently, Muller missed opportunities to discredit Rienbolt and Herrington's version of events. Defendant's post-conviction counsel conducted an investigation of the crime scene and retained experts who examined the evidence and arrived at conclusions contrary to those argued by the State at trial. Defendant asserts that his case was prejudiced because the jury never heard this evidence. The post-conviction investigation of the crime scene focused on three pieces of evidence: the knife wounds, a broken lamp, and a pillow.

The victims' autopsies revealed that the fatal wounds on both victims were six inches deep and 2.5 centimeters wide. The knife that Rienbolt testified she gave to Whitlock to use in the murders was five inches long and 1.3 centimeters wide at its widest point, with a locking mechanism above the hilt (hereinafter, the Rienbolt knife). Police investigators, however, had discovered another knife in the kitchen sink of the Rhoads home (hereinafter, the kitchen sink knife). The kitchen sink knife was eight inches long and 2.4 centimeters wide and had no locking mechanism. Crime scene photographs of the kitchen sink knife were taken, and it was

collected as evidence. The discovery of the kitchen sink knife was noted in a supplemental police report dated August 12, 1986. Muller, however, never learned of the kitchen sink knife, and its existence was first discovered and raised after defendant's conviction.

At trial, Dr. John Murphy, the pathologist who performed the autopsy, testified that the Rienbolt knife was compatible with the victims' wounds. Defendant's post-conviction counsel retained pathologist Dr. Michael Baden to examine the autopsy reports and photographs, trial testimony, evidence, and the two knives. In an affidavit attached to the post-conviction petition, Dr. Baden states that if the Rienbolt knife had been used, he would have expected to see bruising and abrasions, known as hilt marks, around the edges of the stab wounds. There were no hilt marks on the victims' bodies. Dr. Baden concluded that the kitchen sink knife was more compatible with the wounds than the Rienbolt knife. An affidavit by Dr. Murphy was also submitted with defendant's post-conviction petition. In the affidavit, Dr. Murphy stated that since the time of trial he had viewed photographs of the kitchen sink knife. He opined that due to the compressibility of a young person's rib cage and chest wall, the five-inch blade of the Rienbolt knife could have made wounds six inches deep. Although Dr. Murphy would not speculate as to which knife was the more likely murder weapon, he did concede that he would have expected the locking mechanism above the hilt of the Rienbolt knife to leave a mark adjacent to the stab wounds. No marks were observed at the time of the autopsy. Defendant's post-conviction petition also includes the notes of police officer Kevin Ring, who was present at Karen Rhoads' autopsy. Ring's notes contained the comment, "Knife blade at least 6" long Dr. Murphy adv. 5:50 p.m."

Defendant asserts that the kitchen sink knife was

the likely murder weapon, not the Rienbolt knife. He argues that by not conducting an investigation of the crime scene Muller missed an obvious opportunity to bring this suggestion before the court. Defendant notes that Muller did not question Dr. Murphy about the discrepancy between the length of the Rienbolt knife and the depth of the wounds or about the absence of hilt marks around the wounds. Defendant also points out that Muller did not ask Dr. Murphy about the notation in Ring's notes. Nor did he retain his own expert to counter Dr. Murphy's testimony at trial. Muller thus missed a vital opportunity to discredit Rienbolt's testimony that the knife she supplied was used in the murders.

Defendant's post-conviction petition also discloses discrepancies regarding testimony about a lamp. Rienbolt testified that on the night of the murders she saw a broken lamp in the Rhoads bedroom and that somebody was holding a piece of it. A broken lamp was later found in the bedroom, and the State used it to corroborate Rienbolt's testimony. The lamp was not forensically examined before trial. Post-conviction defense counsel had a certified fire examiner examine the lamp. The examiner concluded, based on the lack of smoke stains or soot marks on the inside of the lamp, that the lamp was broken after the fire rather than before. Defendant asserts that the lamp was most likely broken by the firefighters who arrived at the scene. He argues that Muller's failure to obtain expert examination of the lamp, at the very least, deprived him of an opportunity to cast doubt on Rienbolt's testimony.

Lastly, defendant's post-conviction petition raises questions regarding Herrington's testimony about a pillow. Herrington testified that he threw a pillow over Karen Rhoads' face after she had been killed. Dr. Baden's affidavit, however, contends that it was highly

unlikely that the pillow was simply thrown onto Karen's face. Rather, he believed that the pillow was forced onto her face to suppress her screams while she was alive, as evidenced by a witness who heard Karen's screams suddenly stop; the existence of defensive wounds on Karen's arm; the position of the mattress and the bed clothes, consistent with a struggle; and Karen's broken and blood-smeared eyeglasses, found near her head, indicating that the pillow was applied with sufficient force to break her glasses. Defendant asserts that because Muller failed to retain an expert to elicit this testimony at trial, he lost an opportunity to discredit Herrington's testimony.

The State responds that these new contentions do not indicate that Muller handled the evidence improperly, nor do they necessarily exculpate defendant. The State asserts that Muller's decision not to call a forensic expert regarding the knife wounds was one of trial strategy given that the difference between the depth of the wounds and the length of the Rienbolt knife was a matter of common sense easily understood by the jury. Moreover, the State theorizes that both the Rienbolt knife and the kitchen sink knife could have been used to inflict the victims' wounds. The State next argues that the lamp evidence is inconclusive because Rienbolt did not testify to the extent the lamp was broken when she saw it. Thus, at the time of the murders, it is possible that the lamp was not yet broken to the extent necessary for soot to settle inside. Finally, the State maintains that Dr. Baden's analysis of the pillow and Herrington's testimony are not inconsistent. It is possible that the pillow was first used to muffle Karen's screams during a struggle, was removed or fell off her face later, and was subsequently replaced by Herrington.

Defendant further asserts that Muller's faulty

investigation also resulted in missed opportunities to impeach Rienbolt with witnesses whose affidavits were attached to defendant's post-conviction petition. Muller never met with alibi witness Dennis Ouzleman or called him to testify. Barbara Furry was never subpoenaed to dispute under oath Rienbolt's testimony that she and Furry went to the American Legion together July 5. Likewise, Rienbolt's supervisor was not called, notwithstanding her statement that her log indicated that Rienbolt was present at work on July 5, contrary to Rienbolt's testimony. Nor was Eva Jean Trover, the owner-operator of Jeanie's Place, asked to testify, though her affidavit states that she did not see Rienbolt, Rhoads, Whitlock, or defendant in her establishment during the day of July 5. Curtis Smith, a bartender at the Tap Room, was not called to testify that he did not observe Whitlock or Rienbolt in the Tap Room on the night of July 5 and could provide the names of several persons who were there who could verify this observation.

Defendant finally contends that Muller rendered ineffective assistance of counsel in failing to impeach Rienbolt's testimony at trial with three previous inconsistent pretrial statements Rienbolt made to the police. On direct appeal, however, defendant had also asserted that Muller was ineffective for failing to use the contents of three pretrial statements to impeach Rienbolt's testimony. This court found that the inconsistencies between Rienbolt's statements did not work to exonerate defendant and that Muller's cross-examination of Rienbolt was adequate. *Steidl*, 142 Ill. 2d at 242. Defendant's present argument is substantially the same as the one he made on direct appeal, and defendant presents no new evidence to support his related argument in his post-conviction petition. It is therefore foreclosed by the doctrine of *res judicata. Thompkins*, 161 Ill. 2d at 157.

We also observe that Muller testified in a deposition

conducted by post-conviction counsel that some of his decisions were attributable to trial strategy. For example, he did not obtain a forensics expert to testify as to the knife wounds because he felt it unnecessary, as the discrepancy between the length of the Rienbolt blade and the depth of the wounds was a matter of common sense. He chose not to interview Ouzleman, who is hearing impaired and cannot speak, because he believed Ouzleman's alibi testimony would merely repeat the testimony of other alibi witnesses and that he would have difficulty communicating on the stand. No strategic explanation was provided, however, for Muller's failure to conduct an investigation of the crime scene or interview and call some of the post-conviction affiants to discredit the testimony of Rienbolt and Herrington.

Defendant's post-conviction petition has identified several instances where Muller's failure to investigate precluded the jury from hearing evidence. The failure to interview witnesses may indicate incompetence, particularly when the witnesses are known to trial counsel and their testimony may be exonerating. *People v. Greer*, 79 Ill. 2d 103, 123 (1980). Whether a failure to investigate amounts to incompetency depends upon the value of the evidence to the case. *People v. Lopez*, 242 Ill. App. 3d 160, 171 (1993). The evidence in this case was closely balanced. No physical evidence linked defendant to the crime scene and defendant presented an alibi. The jury's decision necessarily rested upon its judgment of the credibility of the witnesses that came before it, primarily Rienbolt and Herrington. Even considering the State's arguments that the new evidence does not necessarily exonerate defendant, defendant's new evidence and proffered affidavits do tend to discredit Rienbolt and Herrington's testimony. Given the balance of the evidence in this case, defendant's post-conviction petition arguments combine to make a substantial showing that

his constitutional rights were violated for purposes of requiring an evidentiary hearing on defendant's post-conviction petition. *Coleman*, 168 Ill. 2d at 537.

*Ineffective Assistance at the Sentencing Hearing*

Defendant next claims that Muller was ineffective for failing to prepare and present sufficient mitigation evidence or witnesses at the sentencing hearing. Defendant's sentencing hearing lasted one day and occurred the day after the trial ended. Muller's presentation at the sentencing hearing consisted solely of a short statement on defendant's lack of a serious criminal history. He presented no witnesses or other evidence in mitigation. Defendant asks for an evidentiary hearing on this issue.

Failure to offer evidence in mitigation does not necessarily demonstrate deficient performance. *Orange*, 168 Ill. 2d at 167-68; *People v. Perez*, 148 Ill. 2d 168, 186 (1992). Ineffective-assistance-of-counsel claims concerning a sentencing hearing must show that counsel's performance fell below minimal professional standards and that a reasonable probability exists that the sentence was affected by the poor performance. *Orange*, 168 Ill. 2d at 168. Courts are highly deferential of trial counsel's strategic decisions regarding the presentation of mitigation evidence. *Orange*, 168 Ill. 2d at 170. Such deference is not warranted, however, where the lack of mitigation evidence results from counsel's failure to properly investigate and prepare a defense. *Orange*, 168 Ill. 2d at 170; *Steidl*, 142 Ill. 2d at 249.

Muller testified in his post-conviction deposition that he did not prepare for the sentencing hearing. He believed that it was highly unlikely that defendant would get the death penalty because he did not have a serious criminal background. Muller was also unaware that the sentencing hearing would immediately follow the trial, and believed instead that he would have one

or two weeks to prepare. Muller further testified that he presented no mitigation evidence or witnesses at defendant's request. In an affidavit accompanying defendant's post-conviction petition, however, defendant contends that he never told Muller that he did not want to present evidence and witnesses in mitigation. Rather, defendant asserts that he told Muller only that he did not wish to testify on his own behalf, but that Muller could present other witnesses. Defendant states that he had at least 10 family members present at the sentencing hearing willing to testify on his behalf. Defendant also provides the affidavits of 27 relatives, friends, and neighbors who were willing to testify but were never contacted by Muller.

Whether or not defendant had instructed Muller not to present mitigating evidence is not dispositive, for while counsel's decision to follow a capital defendant's instructions not to present mitigating evidence will not necessarily support a claim of ineffective assistance of counsel (*Orange*, 168 Ill. 2d at 169), a defendant cannot knowingly waive his right to present mitigating evidence without being fully apprised of the nature and extent of the mitigation evidence available (*People v. Madej*, 177 Ill. 2d 116, 133 (1997)). Where defense counsel fails to conduct an investigation that would reveal possible sources of mitigation, a capital defendant cannot make a knowing waiver. *Madej*, 177 Ill. 2d at 133-34. Here, Muller's own deposition testimony evidences that he did not conduct a mitigation investigation. Therefore, any decision made by defendant as to the presentation of evidence at the mitigation hearing was not an informed one, and defendant could not have made a knowing waiver of his right to present mitigation evidence.

Muller's failure to conduct even a minimal investigation into possible mitigation evidence raises serious

questions as to the effectiveness of his legal representation of defendant. The record indicates that Muller's failure to present any evidence in mitigation stems not from strategic considerations, but rather from sheer lack of preparation and a personal belief that defendant would not be sentenced to death. Muller, knowing he had no mitigation evidence prepared, did not object or ask the judge for a time extension when he was surprised to learn that the sentencing hearing would commence the next day. Furthermore, the affidavits of defendant's relatives and friends demonstrate that there were several obvious mitigation witnesses—defendant's mother, brother, and children, for example—who were ready to testify on short notice and could easily have been called.

Muller's inaction is similar to other situations where this court determined that a defense counsel's assistance fell below the *Strickland* standard or at least warranted an evidentiary hearing. See *Caballero*, 126 Ill. 2d 248 (evidentiary hearing ordered where defense counsel waited until after defendant was convicted to prepare for mitigation hearing, then held a group interview with potential witnesses for one hour); *Perez*, 148 Ill. 2d 168 (court remanded for a new sentencing hearing where defense counsel failed to make even a minimal investigation into the defendant's background, although he possessed information to do so); *Thompkins*, 161 Ill. 2d 148 (court remanded for an evidentiary hearing on counsel's competency where defense counsel failed to contact a number of the defendant's relatives and friends to testify in mitigation).

Accordingly, we must consider whether, absent Muller's allegedly deficient performance, there exists a reasonable probability that the sentence would have been different. While we observe that several of defendant's 27 affidavits are from persons who were only acquaintances of defendant or had not had substantial contact with

defendant in the time directly before the murders, other affidavits are from close family members and friends who swear to defendant's considerate nature and dedication to family. We cannot say that this testimony, coupled with defendant's lack of serious prior criminal history, could not have altered the jury's determination that there was no evidence that mitigated against imposing the death sentence.

Based on Muller's lack of preparation at the sentencing hearing and the weight of the missing mitigation evidence, we hold that defendant's post-conviction petition has made a substantial showing that Muller's performance constituted ineffective assistance of counsel and that the trial court erred when it denied defendant an evidentiary hearing on Muller's performance at the sentencing hearing.

### Newly Discovered Evidence

Lastly, defendant presents two new developments which he asserts warrant an evidentiary hearing. The first involves recantations of trial testimony. Rienbolt and Herrington both recanted their trial testimony after the trial, Rienbolt in an affidavit and Herrington in a statement made in front of a court reporter, though both reaffirmed their trial testimony at the section 2—1401 hearing. Rienbolt has since recanted her trial testimony again, this time in a four-hour videotaped statement. As we noted on direct appeal, the recantation of testimony is regarded as inherently unreliable, and a court will not grant a new trial on that basis except in extraordinary circumstances. *Steidl*, 142 Ill. 2d at 254, quoting *People v. Marquis*, 344 Ill. 261, 265 (1931). Here, Rienbolt recanted once, recanted the recantation at the section 2—1401 hearing, and has since recanted a second time. On direct appeal, we noted that the first recantations were suspect, in part because neither witness was represented by counsel during the

recantations, and no one from the State's Attorney's office was present. *Steidl*, 142 Ill. 2d at 255. The record does not indicate the conditions of or the reasons for Rienbolt's recantation following the section 2—1401 hearing. If Rienbolt's attorney or someone from the State's Attorney's office was present, the recantation might be more credible. Because there was no physical evidence linking the defendant to the crime scene, and further given that the evidence against the defendant was comprised solely of witness testimony, we believe that this specific situation warrants a review of Rienbolt's new recantation at an evidentiary hearing.

Second, defendant's post-conviction petition discloses heretofore unknown facts that indicate Rienbolt and Herrington received money from the State after the trial. Rienbolt received $2,500 "relocation money" in August 1987: $600 paid to her, $900 paid for past-due rent, and $1,000 retained by a police detective until Rienbolt relocated. Rienbolt testified at trial, however, that she did not know of or expect a reward in this case. Defendant asserts that an evidentiary hearing is necessary to determine if a deal had been made before trial in return for which Rienbolt gave testimony favorable to the State. The State counters that evidence that Rienbolt planned on relocating after trial would have damaged, rather than helped, defendant's case in that it would have made defendant appear dangerous. Additionally, the money was received after the trial and the sums were modest.

The knowing use of perjured testimony is a violation of a defendant's due process rights. *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995). This is true even when the testimony does not relate to a material issue, but rather goes to the credibility of the witness. *People v. Martin*, 46 Ill. 2d 565, 568 (1970). If a prosecutor knowingly permits false testimony to be used, the defendant is

entitled to a new trial. *Jimerson*, 166 Ill. 2d at 224. If Rienbolt knew she was to receive compensation of some kind and did not so testify when asked, defendant's due process rights were violated, regardless of whether such information could be construed against defendant. Based on the record before the court, it is not possible to determine whether Rienbolt knew she was to receive money before the trial and on what basis that money was to be given. Accordingly, the trial court erred in not holding an evidentiary hearing at which evidence as to whether Rienbolt expected to receive compensation could be adduced.

Defendant's post-conviction petition also includes a copy of a piece of paper that indicates that Herrington received $240 in November 1987 for "help" with the Rhoads investigation. Other documents indicate that the $240 might have been to reimburse Herrington for wages lost during the trial. Defendant argues that even though the money was not received until after the trial, it is still unknown whether Herrington expected to receive the money at trial. Herrington, however, was never asked at trial whether he was promised anything in exchange for his testimony. Defendant's post-conviction petition has presented no evidence that Herrington lied about any anticipated compensation or that the prosecution relied on any false testimony, and therefore fails to make a substantial showing that defendant's constitutional rights were violated. See *People v. Frank*, 48 Ill. 2d 500 (1971) (where post-conviction petition failed to state or support claim that the State knowingly used false testimony, it is subject to dismissal without an evidentiary hearing). We cannot say that the trial court erred in refusing to hold an evidentiary hearing on whether Herrington expected compensation for his testimony.

### Substitution of Judge

Defendant's post-conviction proceedings were con-

ducted by Judge Paul Komada. At a June 5, 1989, motion hearing on defendant's section 2—1401 petition, Judge Komada informed the parties that he was acquainted with Illinois State Police Special Agent Jack Eckerty, who was an investigator on the case. Four days after this announcement, Judge Komada purchased a houseboat from Eckerty. After the section 2—1401 hearing, and before post-conviction proceedings, Judge Komada bought a second houseboat from Eckerty. Judge Komada did not disclose the second purchase to the parties.

On April 3, 1992, defendant filed the first of three motions to substitute Judge Komada. The first motion, amended September 9, 1992, alleged that Judge Komada's business relationship with Eckerty indicated that Judge Komada was predisposed to have special faith in Eckerty's credibility. The second motion to substitute, filed on November 25, 1992, dealt again with Judge Komada's connection with Eckerty and also his association with defendant's trial counsel Muller, who had been Judge Komada's law partner approximately 15 years earlier. Defendant filed the third petition for substitution on July 18, 1994, after Judge Komada reported post-conviction defense counsel Michael Metnick to the. Attorney Registration and Disciplinary Commission (ARDC). The report to the ARDC stemmed from comments made to the press by Metnick's investigator, William Clutter. Clutter alleged that Muller conducted an inadequate investigation and defense of defendant's case. Judge Komada was displeased that Metnick's investigator was discussing details of an ongoing case with the press and filed a report on Metnick with the ARDC, which was later dismissed without investigation. All three motions for substitution were denied. Defendant contends that the trial court erred when it denied his motions to substitute.

The decision to disqualify a judge is not one to be made lightly. *People v. Vance*, 76 Ill. 2d 171 (1979). A defendant does not have an absolute right to a substitution of judge at a post-conviction proceeding. *People v. Hall*, 157 Ill. 2d 324, 331 (1993). Rather, a defendant must show that he will be substantially prejudiced if his motion for substitution is denied. *Vance*, 76 Ill. 2d at 178; *Hall*, 157 Ill. 2d at 331. Defendant's first two petitions for substitution of judge allege that the judge was familiar with a detective on the case and with defendant's trial counsel. These allegations are insufficient to demonstrate bias. The mere fact the judge has some kind of relationship with someone involved in the case, without more, is insufficient to establish judicial bias or to warrant a judge's removal from the case. See *People v. McLain*, 226 Ill. App. 3d 892 (1992) (the fact that the trial judge and the prosecutor were neighbors, the judge's wife was the godmother of one of the State's Attorney's children, and the judge chaired the State's Attorney's election campaign did not require judge's recusal, especially considering that the case was prosecuted by an assistant State's Attorney); *People v. Anderson*, 95 Ill. App. 3d 143 (1981) (defendant was not deprived of an impartial judge where the judge was a former neighbor of a prosecution witness); *United States v. Kehlbeck*, 766 F. Supp. 707, 711 (S.D. Ind. 1990) (where defendant alleged that judge could not be impartial where the judge had socialized with a witness, the court disagreed, stating that "[r]arely does a judge's mere acquaintance with a party or witness justify recusal"), citing *Clay v. Doherty*, 608 F. Supp. 295 (N.D. Ill. 1985) (where judge's acquaintance with key witness did not justify recusal). At the time of the petitions, there was no evidence that Judge Komada's dealings with Eckerty or prior professional association with Muller colored his decisions.

Defendant's third petition protests that Judge

Komada reported defendant's post-conviction counsel to the ARDC. In *People v. Hall*, the court discussed how a judge is presumed to be impartial even after extreme provocation. To hold otherwise would encourage unruly courtroom behavior as a tactic designed to garner a new judge or new trial. *Hall*, 157 Ill. 2d at 333. Rather, the trial record should be examined to discern signs of bias before a judgment is made on the judge's partiality. *Hall*, 157 Ill. 2d at 333. In the case at bar, the fact that counsel's behavior displeased the judge, whether the displeasure was ultimately unfounded or not, cannot be used as an automatic basis for recusal. Our review of the post-conviction proceedings does not reveal evidence of bias towards defendant based on the ARDC reporting incident. Therefore, the trial court did not err in denying defendant's petitions for substitution of judge.

. Defendant's post-conviction petition makes an additional claim that Judge Komada relied on personal knowledge of Muller's performance in other cases to make his decision on defendant's claims of ineffective assistance of counsel. Upon denying defendant's request for an evidentiary hearing on his post-conviction petition, Judge Komada stated:

> "Petitioner's trial counsel has appeared before it on numerous other occasions involving both criminal and civil cases and has effectively represented clients. In a serious felony case tried before this Court, the Court recalls a defendant being found not guilty by a jury although the evidence against the defendant was substantial. The result was probably attributable to counsel's tactics in presenting the case to the jury.
>
> The court is also aware of a homicide case tried by petitioner's trial counsel to a jury in Vermilion County, Illinois. In that case, the defendant was found not guilty by jury in spite of eyewitness testimony. A result, again, probably attributable to trial counsel's tactics. In the pending post-conviction petition, the court is of the opinion petitioner has failed to establish ineffective assis-

tance of counsel falling below an objective standard of reasonableness or that he was prejudiced by his attorney's performance so as to deny him a fair trial."

We find that defendant's argument concerning Judge Komada's comments regarding Muller's competency has merit. Deliberations of the court must necessarily be limited to the record before it. *People v. Rivers*, 410 Ill. 410, 416 (1951); *People v. Cooper*, 398 Ill. 468, 472 (1947). While all judges come to the courtroom influenced, either consciously or unconsciously, by the experiences, associations, and prejudices developed over a lifetime, they are expected to make an effort to put those predilections aside and make determinations based only upon the evidence presented. *Vance*, 76 Ill. 2d at 179. Judge Komada's statements upon denial of the evidentiary hearing indicate that he relied on personal knowledge of Muller's performance in previous cases to determine his competency in the instant case. In so doing, Judge Komada considered information outside the record, which is prejudicial error. *Cooper*, 398 Ill. at 472; *People v. Holmes*, 69 Ill. 2d 507, 516-19 (1978). Judge Komada's remarks indicate that his associations with Muller have rendered him biased against defendant's ineffective-assistance claims. Therefore, we hold that Judge Komada should be recused from further consideration of this case.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Edgar County dismissing the defendant's post-conviction petition without an evidentiary hearing is reversed. We remand to the circuit court for an evidentiary hearing in front of a newly substituted judge.

*Circuit court judgment reversed;*
*cause remanded with directions.*