# Illinois Official Reports

## Appellate Court

---

### *People v. Williams*, 2020 IL App (1st) 172118

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARNELL WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-2118 |
| Filed | March 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-DV-78635; the Hon. Yolande M. Bourgeois, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Katherine M. Donahoe, of State Appellate Defender's Office, and Natalia Galica (law student), of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Whitney Bond, and Maria D. Lopez, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant, Darnell Williams, was convicted of misdemeanor domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and sentenced to 18 months of intensive domestic violence probation. On appeal, defendant contends that the trial court abused its discretion in denying his posttrial motion without first holding an evidentiary hearing at which he could present evidence that the State's witnesses had recanted. For the reasons that follow, we reverse and remand for an evidentiary hearing.

¶ 2                              I. JURISDICTION

¶ 3      Defendant was sentenced on January 17, 2017, and the trial court denied his posttrial motion on August 4, 2017. Defendant filed his notice of appeal on August 4, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                              II. BACKGROUND

¶ 5      Defendant's conviction arose from an incident involving defendant's wife, Angela Rush, that took place on December 26, 2016. Following his arrest, defendant was charged via misdemeanor complaint with domestic battery. Prior to trial, the State made a motion "for proof of prior offenses." Specifically, the prosecutor indicated that the State was seeking to introduce testimony regarding incidents involving defendant and Rush that occurred on January 14, 2013, April 16, 2013, and April 26, 2014. The trial court granted the State's motion.

¶ 6      At trial, Rush testified that she and defendant had been married for five years but had not lived together since 2013. He was the father of the youngest three of her nine children. With regard to prior incidents, Rush related that on January 14, 2013, she had an argument with defendant because he wanted to drive her car, but he did not have a driver's license. Defendant then hit Rush with his fists. When Rush asked defendant to leave their home, he pulled out what she believed was a gun. After the police arrived, Rush learned that the gun was a BB gun.[1] On April 16, 2013, Rush asked defendant to leave her home because he was drunk. Using his fists, defendant struck Rush "everywhere," including her face, giving her two black eyes. He also banged her head into a windowsill, causing Rush to sustain a gash on her forehead. During the incident, Rush's six-month-old son was thrown to the floor and suffered a bruise to the face. Rush reported the incident to the police but did not pursue charges. On April 26, 2014, defendant, who had been drinking, yelled and screamed at Rush and hit her in the stomach with a broom. Rush was eight months pregnant at the time. Although she gave birth a couple of weeks before her due date, her daughter was healthy. Rush reported the incident to the police and criminal charges were filed against defendant. He subsequently pled guilty to the charges.

---

[1]According to the State's motion for proof of prior offenses, Rush did not proceed with charges, and the case was dismissed.

¶ 7        Rush testified that she and defendant tried to repair their relationship after the April 2014 incident. They remarried in September 2016, but their relationship "failed completely." In December 2016, they were not living together.

¶ 8        On December 26, 2016, Rush invited defendant to her house to visit their children. Around 9:30 p.m., Rush confronted defendant about drinking in front of the children. Defendant became angry, raised his voice, and called Rush names. Rush asked defendant to leave, but he refused. Defendant picked Rush up by her leg and shoulder and slammed her to the floor. He then placed one knee on her and started punching her left side with his fist. Several of Rush's children, including teenagers Dasha D. and David D., ran into the room. They hit and pulled at defendant in an attempt to get him off Rush. Defendant drew back "like he was going to hit them." Rush, who was crying, told defendant to stop and told the children to call 911 rather than try to help her. Dasha called 911, and when the operator answered, defendant got off of Rush and went to the basement. Rush heard him downstairs "tearing up stuff" and calling her names. Defendant left the house through the back door.

¶ 9        In court, Rush identified photographs depicting the bruises she sustained on December 26, 2016. She indicated that her 10-year-old son took the photographs. Rush stated that she was 5 feet 1 inch tall, and defendant was 6 feet 5 inches tall and weighed about 250 pounds.

¶ 10        On cross-examination, Rush admitted that during the incident on April 16, 2013, she stabbed defendant in the thigh. With regard to the incident at issue, she acknowledged that she did not know how many times defendant struck her side or how long she was on the floor while he was hitting her. Rush clarified that although Dasha dialed 911, Rush was the one who talked to the police. When the police arrived at her house, Rush told a female officer what had happened. When defense counsel asked Rush whether she told the officer that her children tried to pull defendant off of her, Rush answered, "Well, they didn't—they didn't get into detail as—like that. They just basically took a brief description of what happened pretty much." Similarly, when defense counsel asked Rush whether she told the police defendant had pinned her down with his knee, she stated that "it never got that far into the conversation." Rush stated that in addition to talking with her, the police questioned her son, David. Rush explained that although the police offered her medical attention, she declined because she did not want to leave her children home alone. She denied having told the police that she was not injured. Instead, she told them she was "just a little sore." Finally, Rush stated that the photographs of her bruises were taken the day after the incident.

¶ 11        David, Rush's 14-year-old son, testified that on the night in question, he was in an upstairs bedroom, playing video games with two of his sisters. About 9:30 p.m., he heard a loud bang and defendant's voice. David went downstairs and saw defendant bending down and punching Rush, who was lying on the floor on her side. David and Dasha started hitting defendant, who "drew back." In court, David demonstrated this action by making a fist and bringing it near his ear. David testified that Rush told defendant not to hit her children and that Dasha called the police. Defendant got off of Rush, and Rush took the phone from Dasha. Defendant then went to the basement, and David could hear "stuff shattering." At some point, the police came to the house and David talked to them. By that time, defendant was no longer at the house. On cross-examination, David stated that he did not remember what he told the police.

¶ 12        Dasha, Rush's 15-year-old daughter, testified that on the night in question, she was upstairs playing video games with her siblings when she heard a "boom sound" and defendant's voice coming from the kitchen. She and her siblings ran downstairs. There, Dasha saw Rush on the

- 3 -

floor and defendant "on top of her," punching her on her side. Dasha and David ran up to defendant and started hitting him. Defendant "drew back" at Dasha and David, "like he was going to hit [them]." In court, Dasha drew her hand back by her shoulder to demonstrate defendant's action. Dasha testified that Rush screamed at defendant not to hit her children. Rush also yelled at Dasha to get the phone and call the police. When Dasha got the phone and dialed, defendant went downstairs to the basement, where she could hear "stuff, like, being thrown." Dasha did not see defendant leave the house but stated he was gone by the time police arrived. Dasha also stated that Rush showed her bruises on her left side that were caused by defendant punching her. On cross-examination, Dasha stated that David took photographs of Rush's injuries.

¶ 13    Defendant made a motion for a directed finding, which the trial court denied.

¶ 14    Chicago police officer Sophia Velazquez testified that she and her partner responded to a call of a domestic disturbance at Rush's house at 10:05 p.m. When they arrived, Velazquez had a conversation with Rush. Velazquez noticed "some children in the back" but did not speak with any of them. She also did not write in her report that there were any children as witnesses to the incident. Velazquez asked Rush what happened. Rush did not tell her that defendant held her down with one knee and punched her with his fists or that her children tried to intervene and pull defendant off her. Rush also did not say that defendant raised his fist and threatened to punch the children. Velazquez did not see any physical injuries to Rush's body. When defense counsel asked whether Rush had stated she was not injured, Velazquez answered, "Well, I offered her—I offered her to call an ambulance. And she said that she didn't need an ambulance. So, she refused EMS [emergency medical services]." Rush did not report any criminal damage to property, nor did she ask Velazquez or her partner to go to the basement to see any broken items.

¶ 15    On cross-examination, Velazquez stated that while they were at Rush's house, her partner stood next to her the entire time and did not talk to anyone independently. When asked about what Rush had told her about her injuries, Velazquez stated, "She said that she was slammed on the ground. I said, 'Okay, well, ma'am, do you need EMS?' She goes, 'Well, I mean, I'm a little banged up. But, I'm good. I don't—I don't—I don't need EMS.' " Velazquez did not ask Rush if any of her children saw what happened. Velazquez also did not recall how long she spoke with Rush or how long she was at Rush's house. She agreed that Rush told her defendant had fled and that she and her partner were going to look for him.

¶ 16    Menard McCorkle testified that he and defendant lived in the same apartment building, about two or three miles from Rush's house. On the night of December 26, 2016, defendant came to McCorkle's apartment around 9 p.m. McCorkle remembered the time because the news had just come on the television. Defendant did not smell of alcohol or appear to have been drinking. They watched television together until McCorkle went to bed around 1 a.m. or 2 a.m.

¶ 17    On cross-examination, McCorkle testified that he remembered the date because when he saw defendant again, defendant told him he was arrested the morning he left McCorkle's apartment. When the prosecutor informed McCorkle that defendant had been arrested on December 28, 2016, McCorkle stated that he was "really not sure what the exact date [defendant]—it was that he came over to my house."

¶ 18    Defendant testified that he was a veteran of the army, having been honorably discharged in 2011. He stated that he had been married to Rush for about five years and that they had three

children together. In December 2016, he stayed at Rush's house for about three weeks because a friend of Rush's was staying at his apartment.

¶ 19 On December 26, 2016, defendant spent the day at Rush's house, putting the living room and dining room back in order because the floors had just been replaced. Defendant denied drinking alcohol that day. Around 8 p.m., he sat down to take a break from moving furniture. Rush came out of her bedroom and became upset that he was not working. An argument ensued, during which defendant and Rush yelled at each other. Defendant denied that the argument escalated into physical violence. Eventually, defendant told Rush, "You know what, f*** you. I'm leaving. Bye." Defendant picked up his coat and was heading out the back door when Rush replied, "B***, that's why you going to jail."

¶ 20 Defendant stated that he saw David and Dasha come downstairs before he left the house but denied that he had any sort of altercation with them. He denied picking up Rush, slamming her to the ground, holding her down with his knee, or hitting her in any way. He also denied threatening to hit Rush or her children and denied that the children hit him. Defendant testified that after he left Rush's house, he took the bus to McCorkle's apartment. He arrived around 9 p.m. or 9:30 p.m., while McCorkle was watching the news on television.

¶ 21 On December 28, 2016, defendant went to the domestic violence courthouse to see if a warrant had been put out for his arrest. He explained that he did this because Rush had "done it before" and because when he left her house on December 26, she said he was going to jail. Defendant spoke with a sergeant and had the clerk's office run his name. Defendant was told there were no warrants for him. As he left the courthouse, defendant saw Rush arrive. He waited to see what would happen and was arrested within 20 minutes.

¶ 22 On cross-examination, defendant clarified that five of Rush's friends were staying at his apartment during the time in question. However, he did not know any of their names. Defendant admitted that he and Rush would "argue a lot" but denied that they would fight and declined to characterize their relationship as volatile. When asked if there had been "violence in your home a lot," defendant answered, "Not physical violence; verbal violence, correct." Defendant viewed the photographs of Rush's bruises and stated he was "not sure" where the bruises came from.

¶ 23 Following closing arguments, the trial court found defendant guilty of domestic battery. The court stated that it found defendant's alibi to be a "fabrication," as McCorkle did not know what day defendant was at his apartment. The court also found defendant's testimony that he did not know the names of five people living in his apartment for three weeks not credible. After noting defendant's testimony that he and Rush had never had a physical altercation, the court stated:

> "Then, why'd you plead guilty on April 26th [2014]? *** To hit[ting] her about the body with a stick. You pled guilty to that. And then, you want to testify there's never been any physical altercations. There were two other incidents that I allowed in. Your testimony was totally incredible."

Finally, the trial court stated that the State's witnesses' testimony was clear, consistent, and credible.

¶ 24 Immediately following the trial court's finding of guilt, the court sentenced defendant. The State argued in aggravation that defendant had 27 pending cases for domestic violence, and although an order of protection was in place, Rush had made additional police reports against

defendant in the week preceding trial. In mitigation, defense counsel argued that defendant was a veteran, was enrolled full-time at a media school, and had only one misdemeanor conviction for which he received a sentence of supervision that he completed successfully. The trial court sentenced defendant to 18 months of intensive domestic violence probation and issued a two-year order of protection against defendant.

¶ 25 Nine days after trial and sentencing, Rush, on her own behalf, filed a motion to dismiss the order of protection. The trial court denied the motion. Later that day, Rush filed a motion to modify the order of protection. At a hearing on the motion, Rush explained that she was seeking modification because she and her children received housing benefits through defendant based on his status as a veteran and, because the order of protection barred contact by any means, "they" would not give him certification to continue the funds. The trial court denied the motion.

¶ 26 Within 30 days of trial and sentencing, defendant filed a motion to reconsider the finding of guilty or, in the alternative, for a new trial. In support of his argument for reversal, defendant argued that Rush and David had been impeached by Officer Velazquez's testimony and that the photographs of bruises on Rush's body were inconsistent with the alleged acts of battery. In support of his argument for retrial, defendant argued that it was improper for the trial court to have allowed evidence of other crimes at trial. When the motion was called for hearing about four weeks later, defense counsel indicated he had just received the trial transcript and would be filing an amended motion. The court continued the case.

¶ 27 After another continuance, defendant, on April 27, 2017, filed an amended motion to reconsider the finding of guilty or, in the alternative, for a new trial. In the amended motion, defendant added a claim that a new trial was warranted based on newly discovered evidence that all three of the State's occurrence witnesses—Rush, David, and Dasha—had recanted. Defendant argued that the witnesses' statements, which he attached, directly contradicted their trial testimony, corroborated his own testimony that he argued with Rush but left the house without a physical altercation, and explained why the photographs of Rush's injuries were inconsistent with the beating she described at trial. In her attached statement, Rush related that on the night in question, she and defendant "only had an argument & the photo of injury that was used was from a prior incident." David wrote that although he heard defendant and Rush arguing, he "didn't witness my stepdad [defendant] hit my mother. My cousin was the one who told me to tell a lie." Finally, Dasha recounted in her statement that defendant and Rush were arguing, but she "did not see [defendant] hit my mom, my cousin told me them things [*sic*] so my mom would leave [defendant]. The bruises (in the photo) on my mom did not happen on Dec. 26th. It is from a previous event."

¶ 28 On June 22, 2017, Rush filed another motion to dismiss the order of protection. At a hearing on the motion four days later, Rush explained that she wished to have the order modified so defendant could help with the children. She had a chronically ill son who might need open heart surgery and three of her children had to go to summer school. She did not have a support system, and defendant could help the children get to school. She also wanted to reconstruct "our family" and attend counseling, but it was "impossible to get these matters met if there's an order of protection of no contact between us." After Rush finished speaking, the trial court asked the prosecutor, "Didn't he just pick up another conviction?" When the prosecutor informed the court that defendant had pled guilty to a felony, the trial court denied Rush's motion.

¶ 29    Defendant's amended motion to reconsider the finding of guilty or, in the alternative, for a new trial was heard on August 4, 2017. At the hearing, defense counsel stated he wanted to "begin by calling the three witnesses I wish to call." The State objected, arguing that the trial court would need to decide whether it would grant an evidentiary hearing before witnesses could be called. Defense counsel responded that he wished to have an evidentiary hearing to present testimony from David, Dasha, and the investigator who witnessed their written statements. Counsel explained that the investigator would testify that counsel and the investigator spoke to David and Dasha individually and that Rush was not with them during their conversations. The court responded, "I'm not going to have [an] evidentiary [hearing] for that. I saw those witnesses testify. I saw that. Now you are going to want me to substitute my own judgment about their credibility to your investigator?" When counsel stated that the investigator would provide additional foundation for the written statements, the following exchange ensued:

> "THE COURT: No. I'm not having an evidentiary hearing for that when I already heard from the witnesses' own mouth[s] what allegedly happened. And what happened since I found him guilty.
>
> [DEFENSE COUNSEL]: So Judge, I am asking also for David *** and [Dasha] *** to testify again. Testify under oath. And if I just may—
>
> THE COURT: They testified under oath before.
>
> [DEFENSE COUNSEL]: They did.
>
> THE COURT: And they were cross-examined.
>
> [DEFENSE COUNSEL]: They did.
>
> THE COURT: No. I'm not going to rehear the same evidence. I'm not going to do it.
>
> [DEFENSE COUNSEL]: Well, [Y]our Honor, it won't be the same evidence because they're going to testify differently than what they did on—
>
> THE COURT: No, they're not. No, they're not. They had their opportunity. I found them to be credible. If you think otherwise then you need to appeal my—I'm not going to have—I'm not going to listen—this can go on for ever and ever.
>
> [DEFENSE COUNSEL]: Judge, if I may then make an offer of proof so that I can make the record for that appeal if that becomes necessary. Because what David and [Dasha] would testif[y] to if they were allowed at this—
>
> THE COURT: They already testified. Why would I want to have them retestify? No, no.
>
> [DEFENSE COUNSEL]: Your Honor, I understand you're denying my request to have an evidentiary hearing.
>
> THE COURT: No, no. If—and still didn't I read in one of these pleadings that there was some cousin or somebody who allegedly got them to lie[?] Didn't I read that in there somewhere?
>
> [DEFENSE COUNSEL]: Your Honor, I believe it was [Dasha] said that it was her cousin who told them to lie about [defendant] hitting [Rush].

THE COURT: Okay. So if that's true, then I would let you put that person on the stand so I can judge that person's credibility. But I'm not going to call the same witnesses up here again."

¶ 30       Following this colloquy, the trial court indicated it would not be holding an evidentiary hearing but allowed defense counsel to argue the other points raised in the posttrial motion. After further argument, the trial court denied the motion to reconsider and denied the motion for a new trial. Defendant filed a timely notice of appeal.

¶ 31                                   III. ANALYSIS

¶ 32       On appeal, defendant contends that the trial court abused its discretion when it denied his motion for a new trial while refusing his request to present newly discovered evidence. Defendant argues that the recantations he attached to the motion may be considered new evidence, even though he would have known at trial that the witnesses were perjuring themselves, because he did not have evidence at the time to demonstrate that the witnesses were lying. The trial evidence against him consisted solely of witness testimony, and all three of those witnesses recanted. Defendant argues that the evidence presented against him at trial was not overwhelming and should be reevaluated in light of the recantations. He points out that Rush's and David's trial testimonies were undercut by Officer Velazquez's testimony that she did not speak to any children at the scene or make a note in her report of any children as witnesses to the incident and by her testimony that Rush did not relate details of the incident to her. Also, the light bruising depicted in the photographs did not comport with the beating Rush described, and the witnesses identified different individuals as the person who took the photographs. In summary, defendant argues that the trial court abused its discretion when it "refused to consider the subsequent recantations of all three of the State's witnesses" and seeks a new posttrial hearing where the defense would have an opportunity to present recantation testimony from "the trial witnesses."

¶ 33       Motions for a new trial on grounds of newly discovered evidence are not looked upon favorably by the courts and are subject to the closest scrutiny. *People v. Williams*, 295 Ill. App. 3d 456, 462 (1998). The denial of a motion for a new trial based on newly discovered evidence will not be disturbed on appeal absent an abuse of discretion. *Id.* Moreover, a trial court may dispose of a motion for a new trial based upon newly discovered evidence without holding a full evidentiary hearing so long as the court's decision is not an abuse of discretion. *People v. Smith*, 177 Ill. 2d 53, 82 (1997). An abuse of discretion occurs when a trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Beard*, 356 Ill. App. 3d 236, 243 (2005).

¶ 34       Recantation testimony is regarded as inherently unreliable. *People v. Steidl*, 177 Ill. 2d 239, 260 (1997). As such, a court should only grant a new trial on the basis of newly discovered recantations in extraordinary circumstances. *Id.* (postconviction proceedings); *Beard*, 356 Ill. App. 3d at 242 (proceedings on motion for new trial). With regard to whether a court should grant an evidentiary hearing on the basis of newly discovered recantations, our supreme concluded in *Steidl* that newly discovered recantations warranted a third-stage postconviction evidentiary hearing where there was no physical evidence linking the defendant to the crime, the evidence against the defendant was comprised solely of witness testimony, and all the key witnesses had recanted. *Steidl*, 177 Ill. 2d at 261.

- 8 -

¶ 35    The instant case presents the same situation present in *Steidl*. As in *Steidl*, there was no physical evidence linking defendant to the crime, the evidence against defendant was solely testimonial, and all of the key witnesses have recanted their trial testimony. Given these circumstances, we find that the trial court abused its discretion in denying defendant's posttrial motion without first holding an evidentiary hearing to consider Rush's, David's, and Dasha's recantations. Therefore, we reverse and remand for an evidentiary hearing at which defendant may present testimony from those trial witnesses, and the trial court may evaluate their credibility and rule upon defendant's posttrial motion accordingly.

¶ 36                                              IV. CONCLUSION

¶ 37    For the foregoing reasons, the judgment of the circuit court is reversed, and the cause is remanded for an evidentiary hearing.

¶ 38    Reversed and remanded with directions.