NOTICE

Decision filed 01/02/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220045-U

NO. 5-22-0045

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 10-CF-104 |
| | ) | |
| RICHARD TURNER, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in denying defendant's motion to continue the trial to allow him to retain a new expert or in denying defendant's request for an evidentiary hearing based on inadmissible juror affidavit; while defendant's conviction is affirmed, the cause is remanded for resentencing where mandatory life sentence provision previously found to violate the single-subject rule has not been reenacted.

¶ 2    In April 2010, the defendant, Richard Turner, was charged with first degree murder in the death of four-year-old Jessika James (720 ILCS 5/9-1(a)(2) (West 2010)). Following a jury trial, the defendant was convicted and sentenced to a term of natural life in prison. On appeal, the defendant asserts the trial court erred in denying his motion to continue to allow him time to retain a new expert, erred in failing to hold an evidentiary hearing on juror misconduct allegations, and erred in sentencing the defendant to a mandatory life sentence based upon a sentencing provision

1

which had previously been struck down. We affirm the defendant's conviction and remand for a new sentencing hearing.

¶ 3                                    I. Background

¶ 4                            A. Pretrial Proceedings

¶ 5     On April 7, 2010, the defendant was charged by indictment with first degree murder of four-year-old Jessika James, the daughter of his girlfriend, Brandi James. On February 15, 2012, the State charged the defendant by information with the second degree murder of Jessika (*id.* § 9-2(a)(1)). The defendant entered into a negotiated plea to second degree murder in exchange for a concurrent 20-year prison sentence. Two days later, the State filed a motion to vacate the sentence arguing that second degree murder was required to be served consecutively to the 22-year sentence previously imposed in case number 10-CF-206. The defendant then filed a motion to withdraw his guilty plea arguing that the trial court failed to admonish him regarding the mandatory consecutive sentences. The trial court granted the defendant's motion to withdraw his guilty plea, and the case was set for jury trial.

¶ 6     Prior to trial, the State filed a motion *in limine* seeking to introduce evidence at trial, pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), of the defendant's prior bad acts of physical abuse of Jessika in the months prior to her death. The trial court allowed the prior bad acts evidence on the issues of motive, intent or absence of accident, over the defendant's objection. However, the trial court denied the State's request to introduce evidence from another case alleging sexual abuse of a different individual by the defendant.

¶ 7     The State filed its first notice of potential expert witness testimony on April 19, 2012, two years after the defendant was charged with murder. On September 6, 2012, the State filed a motion to compel the defendant to disclose his expert witness. On the following dates, the defendant filed

2

motions to appoint a forensic expert to counter the State's experts who were expected to testify regarding the manner and cause of death: September 20, 2012; December 31, 2012; and January 18, 2013. In each motion, the defendant asserted that he had been incarcerated for over two years and was unable to afford to hire an expert. In addition, he asserted that his family did not have the resources available to aid in the costs of hiring an expert and that "the minimal cost [was] well over any amount available to the Defendant and/or his family." The defendant's third amended motion stated that Dr. Harvey Cantor, a pediatric neurologist, would "review all of the records and issue his opinion" for $3500.

¶ 8 On January 25, 2013, the trial court found that the defendant was indigent and that appointment of an expert was crucial to his defense. The trial court ordered the county treasurer to pay Dr. Cantor $3500 to review the case. Following the payment, the defense decided not to retain Dr. Cantor and filed a motion to continue the case to allow the defense to obtain another expert to testify on the defendant's behalf.

¶ 9 On March 4, 2013, the State submitted a notice to the court of its intent to seek an enhanced sentence of natural life imprisonment. Within that notice of intent, the State cited section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012)), a statute that imposed a mandatory term of natural life imprisonment for "a person who, at the time of the commission of the murder, had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age."

¶ 10 On March 6, 2013—four months after the matter had been set for trial and five days before the scheduled jury trial date—the defendant filed a motion to continue, asserting that although Dr. Cantor had performed an initial review of the case, he had not been retained to testify. The defendant argued that if he were forced to proceed to trial without an expert, it would be highly

3

prejudicial and patently unfair to his defense, but that a continuance of the jury trial would not prejudice the State.

¶ 11    In opposition, the State argued that the defendant had been provided funds to retain the services of Dr. Cantor, an expert of the defendant's choosing. The State alleged, and the defendant did not deny, that the reason the defendant wished to continue the jury trial was to allow him time to retain a new expert because Dr. Cantor's opinion was adverse to the defendant's case. The State further argued that it would suffer substantial prejudice if the trial was continued since the case had been pending over three years. One of the State's witnesses, a police officer, had died. A witness that the State deemed as critical would be retiring in June 2013. The State also argued that Dr. Mary Case, the chief medical examiner who had reviewed medical records, police reports, and other documents in preparation for jury trial, may no longer be available if the trial were continued; or if she were available for a new trial date, Dr. Case once again may have to review all of the records to prepare for trial at the State's expense. Finally, the State argued that the case was coming up on the fourth anniversary of Jessika's death and that crime victims, such as Jessika's mother, have a right to timely disposition of a case following the arrest of the accused.

¶ 12    At the motion hearing on March 8, 2013, the defendant, by counsel, alluded to some "difficulty" he had experienced with Dr. Cantor although he did not elaborate on the nature of the difficulty. Defense counsel informed the trial court that Dr. Cantor had requested an additional $1000 for further work on the case and acknowledged that he had not requested the trial court to release additional funds, further stating that he had requested "some type of report from Dr. Harvey Cantor whereupon he stated he would not provide a report, but if we would write a report for him he may sign it. He also is stating that he would need an additional $7,000 for his testimony in this matter and he has, to coin a phrase, gone south on us." Defense counsel then reported that the

4

defendant's family had offered to raise money to pay for an expert via bank loans with a car and real property serving as collateral. He argued, "It is the defendant's position that allowing this trial without allowing the defendant an opportunity, a further opportunity to secure an expert in this matter would be highly prejudicial, would handcuff the defendant, so to speak, with regards to cross-examination of the State's stated experts in this matter."

¶ 13    The State contended that the defendant's motion to continue should be denied, first, because, "through conversations between [defense counsel] and myself it was learned that Mr. Cantor had told the defense that Jessika's death was due to child abuse, but he couldn't pinpoint the injury or the date that the injury occurred. So I assumed, based on that, the defense decided they didn't want him." The State next contended that funding for another expert was speculative because it depended on the decision of the bank. The State noted the case was three years old, one prosecution witness had died, and further delay would prejudice the prosecution. The State reported that the prosecution witness Dr. Robert Paschall who was on staff at Children's Hospital in St. Louis would testify without charge, but he was planning to retire and, thereafter, would likely request payment. The State urged the court that Dr. Paschall could be hard to locate after he retired as he previously worked in Honduras. The State noted that expert witness Dr. Case already had been paid a large sum of money and that a continuance would increase that amount because she would have to review the case again. Finally, the State argued the crime victim's statute provides victims with the right to the timely disposition of criminal cases.

¶ 14    The trial court noted the case previously had been continued to March 11, 2013, for a jury trial. After reviewing the record, the case file, and considering the parties' arguments, the trial court denied the defendant's motion to continue.

5

¶ 15                                    B. *Voir Dire*

¶ 16     The case proceeded to a jury trial on March 12, 2013. During *voir dire*, Juror No. 197 told the trial court he was familiar with the defendant's case because he had seen local news coverage about it and had researched the case on the internet. Juror No. 197 stated that what he knew about the case would not prevent him from being a fair juror. After examining Juror No. 197, defense counsel and the State accepted him to serve on the jury.

¶ 17                                    C. The Jury Trial

¶ 18     After the jury was selected, the eight-day jury trial began on March 13, 2013. At the end of each day of trial, the court admonished the jury not to talk to anyone about the case; not to listen to, watch, or read news reports about the case; and not to conduct any internet or social media research concerning the case.

¶ 19     At trial, Brandi, Jessika's mother, testified that she first began her relationship with the defendant around September or October 2008 when Jessika was 3½ years old. The defendant was living with them at the time of Jessika's death. The defendant's children and another relative would occasionally stay with them. Brandi testified that the defendant was controlling and gave her rules about caring for Jessika. If Jessika woke up in the night, he was the one to check on her. He would not allow Brandi to get up in the night to check on her daughter. She stated that Jessika would wake up once or twice every night. He wanted to be the one who disciplined Jessika because he thought Brandi babied her.

¶ 20     Brandi testified that although Jessika had been toilet trained for a year and a half, she began to have "accidents" after the defendant moved in with them. When Jessika had an accident in her pants, the defendant would get "very, very mad" and make her sit in her soiled clothes. She also testified that the defendant was the one who gave Jessika a bath whenever she had these accidents,

which was two or three times a week. Brandi was not allowed to take Jessika with her when she went to the store, and Jessika would cry when her mother left.

¶ 21    Brandi testified that in the days leading up to her death, Jessika was fine. Jessika had stayed with Brandi's mother the previous weekend. At some point during the week, Jessika had thrown up after drinking a can of orange soda at the store. On June 18, 2009, Brandi heard Jessika fall in the bathroom at home around 2 or 3 a.m. Brandi saw a little scratch on her head, put a Band-Aid on it, and Jessika went back to sleep. The next morning, on June 19, 2009, Jessika was excited that the defendant's four-year-old son, Noah, was coming to visit. Jessika ate and did normal activities that day.

¶ 22    When Noah arrived around 4:30 that afternoon, he and Jessika played on Noah's four-wheeler. Brandi described it as a child's four-wheeler with a remote control that an adult could use to slow it down if the four-wheeler was going too fast. Brandi testified that as the children were going around a tree, the four-wheeler tipped over and they fell off. Neither of the children were hurt, and Jessika continued to play with Noah. Jessika did not complain, and Brandi did not see any injury on Jessika.

¶ 23    Around 10 or 11 that night, the children went to sleep on the couch next to the defendant. Brandi's brother, Stephen Hayes, came over after the children were asleep. Brandi and the defendant carried the children to the bedroom and laid them on a pallet on the floor. After her brother left, Brandi left to go to the convenience store. Before Brandi could enter the store, she received a phone call from the defendant telling her to come back home.

¶ 24    When Brandi arrived, she observed Jessika lying on the living room floor with the defendant leaning over her. Brandi stated that it looked like her daughter was having a slow-motion seizure. When Brandi asked the defendant what happened, he told her that when he went to check

7

on Jessika, she was not on the pallet in the bedroom but was in the corner of the bedroom. Brandi testified that Jessika's clothes were wet like she had just gotten out of the bath with her clothes on. The defendant told Brandi that he had put ice on Jessika to try to revive her. Brandi immediately called 9-1-1.

¶ 25    Greg Branch testified that he was one of the EMTs who responded to the residence after receiving a report that a young female child was having a seizure. When they arrived, the defendant was standing outside on the porch. When they entered the residence, they observed Jessika lying motionless on the living room floor with her mother kneeling over her. Jessika's legs were straight and stiff with her ankles turned in. Her arms were down at her side, both straight, with her fists turned in. Branch testified that what he observed was a medical condition known as posturing, which is a sign that a person has head trauma as opposed to a seizure. Jessika was not responsive, and her eyes were rolled back in her head. Branch immediately transported Jessika to the hospital emergency room.

¶ 26    Branch testified that Jessika's mother came to the hospital. He stated that Brandi was crying, and he described her as "pretty hysterical." He testified that the defendant appeared "unusually calm." Branch recalled seeing bruising on Jessika's abdomen, on her kidney area on her back, and on her legs. He recalled that Jessika had a little bump on her forehead with a Band-Aid over it. He also noted that Jessika "had a lot of hair missing." Branch testified that when he later spoke with the defendant, he mentioned that Jessika had been to her dad's house in Shawneetown and had fallen off a four-wheeler. Branch also testified that Brandi had also told him that Jessika had been injured on a four-wheeler. At trial, Brandi testified that Jessika's father had never lived in Shawneetown and, to her knowledge, had never owned a four-wheeler.

8

¶ 27    Jason Vinyard, another EMT who was called to the scene, testified that the defendant told him that Jessika had been sleepwalking and that he had carried her into the living room and laid her on the floor. The defendant told him that the day before Jessika had been riding a four-wheeler at her father's house in Shawneetown when she fell off and hit her head. The next day, however, Jessika was behaving normally. At the hospital, Brandi informed Vinyard that for approximately the last three months Jessika had been passing out and having seizures. Vinyard testified that Brandi also told him that Jessika had fallen off the back of a four-wheeler and hit her head. She also reported that Jessika had been falling and stumbling around a lot lately and had been sleepwalking a lot.

¶ 28    Anita Mitchell, a registered nurse, testified that she attended to Jessika in the emergency room. She testified that Jessika was unresponsive when she arrived. Her pupils were non-reactive to light. Mitchell testified that Jessika's symptoms indicated that she had suffered a massive head trauma not typically caused by a fall. Her nursing notes indicated that Brandi had reported that Jessika had hit her head on concrete the previous day. In describing Jessika's physical condition, Mitchell noted that Jessika's hair was "very sparse," similar to a patient undergoing chemotherapy. Jessika had head lice as well as scabies.

¶ 29    Pennie Smith, a physician's assistant, testified that she also was present in the emergency room when Jessika was brought in. Smith observed that Jessika was posturing, which indicated that she had sustained a brain injury. Smith testified that a CT scan of Jessika's brain revealed a subdural hematoma, or bleeding in the brain. Smith accompanied Jessika when she was transported to St. Louis Children's Hospital.

¶ 30    A few days later medical tests revealed that Jessika did not have sufficient brain activity to justify keeping her on life support. On June 22, 2009, doctors removed her life support, and Jessika died as a result of the injuries she sustained on June 19, 2009.

¶ 31    Illinois State Police Special Agent Gwendolyn Basinger testified that she interviewed the defendant on June 21, 2009, at Children's Hospital. The defendant told her that on June 17, 2009, Jessika vomited at a store and later fell at home on the way to the bathroom, sustaining a scratch on her forehead. He also reported that on the evening of June 19, 2009, Jessika and Noah fell asleep on the couch while watching television. The defendant and Brandi put the children to bed on a pallet in the bedroom. The defendant reported that Jessika was fine when they put her to bed that night. They went outside, and Brandi left to go to the convenience store. The defendant reported that Brandi had been gone about seven minutes. During this time, he secured the children's four-wheeler to a tree. When he tried to reenter the home, he found the front door was locked. He entered the home through the back door and went to check on the children when he saw Jessika in the corner of the room, lying stiff and motionless. The defendant carried her to the living room and called Brandi.

¶ 32    The defendant reported to Agent Basinger that he had no explanation for why Jessika was in the condition he found her. He also reported that no one else was in the home at that time, other than himself and his four-year-old son. When asked if Noah could have harmed Jessika, the defendant stated that Noah did not have time to have done anything to Jessika. The defendant also stated that there was no way that anyone could have entered the home without his knowledge, and no way anyone could have entered the home, injured Jessika, and left without him knowing it. Basinger testified that the defendant did not report to her that Jessika had been injured by a crash of a four-wheeler at her father's home.

10

¶ 33    Stephen Hayes, Jessika's uncle, testified that when he arrived at his sister's home at approximately 9:30 p.m. on June 19, 2009, his sister, the defendant, Jessika, and Noah were the only ones there. The children were sleeping on the couch. Jessika did not appear to be in distress. When he left at approximately 10 p.m., Jessika was still sleeping. After Hayes learned that Jessika had been transferred to a hospital after an injury, he spoke with the defendant over the telephone to ask what had happened to Jessika. The defendant told Hayes that Jessika had suffered a seizure. He also told Hayes that he had observed Jessika standing in the corner of the bedroom in a catatonic state.

¶ 34    Dr. Kimberly Quayle, a specialist in pediatric emergency medicine, testified on behalf of the State. Dr. Quayle treated Jessika in the emergency room on June 20, 2009, when she was brought to St. Louis Children's Hospital at approximately 4:30 a.m. When Jessika arrived, she was in critical condition. When Dr. Quayle asked the defendant and Jessika's mother what happened, they reported that they put Jessika to bed around 10:30 p.m. Afterwards, her mother left to go to the store, and a few minutes later she received a call from the defendant saying that Jessika was having a seizure. They reported that Jessika was found on the floor by the closet. Both the defendant and the mother reported a fall during the evening of June 17, 2009, when Jessika was walking to the bathroom. She had a small cut on her head, but she had experienced no loss of consciousness and had been acting appropriately following her fall. They also reported that she had been riding a small four-wheeler earlier in the evening, but she had no fall or known injury associated with riding the four-wheeler. They reported no other trauma. They stated that Jessika always had bruises because she was a normal four-year-old child.

¶ 35    Dr. Quayle performed a physical examination of Jessika. The doctor noted that she was unresponsive and posturing. She described her as a "very dirty, small child." She noted that Jessika

11

had thinned hair. Dr. Quayle testified that bruises on Jessika's left upper chest wall were unusual for a child and made her concerned about non-accidental trauma. An abdominal CT scan revealed a fracture of Jessika's L3 vertebra, which was in the lumbar region of her lower back. A follow-up CT scan of her head revealed that the subdural hematoma had increased in size causing Jessika's brain to shift and there was swelling of her brain. After examining Jessika, reviewing the scans and test results, Dr. Quayle determined within a reasonable degree of medical and scientific certainty that Jessika had a very significant head injury, and there was no history provided by the mother or the defendant to explain the injury. This determination caused Dr. Quayle to suspect a non-accidental trauma, and the child protection team was contacted about Jessika's case. Following the diagnosis, doctors performed surgery in an attempt to relieve some of the brain swelling. On cross-examination, Dr. Quayle testified that in the absence of a plausible explanation of an accident, concerns arise that an injury might be caused by child abuse, and she would then make a referral to the child protection team.

¶ 36    The defendant testified that he and Brandi started living together approximately January or February 2009. The defendant described Jessika as a quiet child. He denied making Jessika sit in her soiled clothes when she had an accident. The defendant testified that Jessika's hair was falling out. He reported that sometimes in the morning when she woke up, she would have hair on her hands from scratching. He testified that on occasion he would give her a bath with a bit of bleach in the water to help with her skin condition. The defendant stated that they would put anti-itch creams on Jessika, and sometimes gloves on her hands at night, but nothing prevented her from scratching to the point where she would draw blood. He also stated that they put scarves on her head to keep her from scratching at her head and pulling at her hair.

¶ 37    Darion Turner, the defendant's son, described his father as physically abusive to him and having a "very bad temper." He testified that when he was between the ages of six and eight, the defendant choked Darion after telling him that he had been disrespectful. The defendant took Darion to the bathroom, pulled down his pants, and "whooped" him. Darion testified that he had observed the defendant hit his brother Trey on multiple occasions. He stated that he observed the defendant get into physical fights with his sister Tnea where he would hit her with open and closed fists.

¶ 38    Prior to the defendant's arrest, he talked to Darion about what happened to Jessika on the night of June 19, 2009. Darion testified that the defendant gave him three different versions of what happened that night. The first version was that the defendant had been locked out of the house and saw Jessika through the window having a seizure, but he was unable to get into the house. The second version was that the defendant heard a noise in the bedroom which he described to Darion as a "thud" on the wall. When he entered the room, he found Jessika unconscious. The third version was that after the defendant put the children to bed, he heard something. When the defendant went to the bedroom, he observed Jessika having a seizure. The one constant in each version was that the defendant called Brandi and his mother after finding Jessika and waited until they got there to call the EMTs.

¶ 39    Steven Morris testified on behalf of the State. Morris admitted that he had a criminal record but that he had not been offered any deal from the State in exchange for his testimony. Morris stated that he and the defendant had been friends for a short time. He knew the defendant to have a bad temper and even admitted that he was personally afraid of the defendant. Morris had occasion to stay at the defendant's home in April 2009. He described Jessika as a very happy little girl with

13

an outgoing personality when he first met her, but he noted that her demeanor changed over time. He believed that Jessika was afraid of the defendant.

¶ 40    Morris testified that he, the defendant, Brandi, and Josh Gibbs were present when he saw the defendant "drag" Jessika by her arm from the living room to the bathroom. Morris estimated that the defendant remained in the bathroom with Jessika for approximately 30 to 40 minutes. He saw Brandi leave the room and come back, sit down, and begin to cry. On a couple of occasions Morris observed the defendant take Jessika into the bathroom to give her a bath, each time staying in the bathroom with Jessika for approximately 30 to 40 minutes. Morris recalled one evening that he was at the defendant's house when he observed the defendant grab Jessika up by her hair because she had urinated on the couch. He described the defendant as very angry and stated that on at least two or three occasions the defendant had gotten angry over Jessika urinating while she was asleep.

¶ 41    Following Jessika's death, the defendant told Morris different versions of what happened that night. First, the defendant stated that he found Jessika on the floor, halfway lying on the toy box. Then he told Morris that he found Jessika lying on the floor having a seizure. Later the defendant stated that he found her on the floor and called 9-1-1. Finally, he told Morris that he called Brandi to tell her to hurry home because he found Jessika having a seizure, and when she got home, he had Brandi call 9-1-1.

¶ 42    Joshua Gibbs testified on behalf of the State. Gibbs admitted that he was testifying as part of a plea deal from the State. In exchange for his testimony, the maximum sentence Gibbs could receive on a methamphetamine possession charge was seven years with a recommendation of impact incarceration. Gibbs first met the defendant around January 2009. He had been at the defendant's home many times prior to June 19, 2009.

14

¶ 43    Gibbs testified that on one occasion during the month prior to Jessika's death, he and Morris were at the defendant's home. He stated that Jessika and Noah were asleep on the couch while he was in the bedroom using methamphetamine. Gibbs testified that the defendant left the bedroom and went into the living room where Jessika was sleeping on the couch. Gibbs observed the defendant pick Jessika up by her hair. The defendant grabbed her feet, ripped off Jessika's pajamas and her underwear, and dropped her on the floor. The defendant then grabbed Jessika off the floor by her arm, hit her with a closed fist three or four times, and dragged her down the hallway to the bathroom. Gibbs observed Jessika pull her arm away from the defendant when they got to the bathroom door. The defendant immediately grabbed Jessika by her hair and threw her into the bathroom. Gibbs stated that Jessika never made a sound, but she had tears in her eyes. Gibbs described the defendant as being so out of control that he did not want to return to the home because he was afraid of the defendant. Gibbs also testified that during the many times that he had been to the home, he had never seen Brandi physically harm Jessika. On cross-examination, Gibbs admitted that he had waited 2½ years to report these incidents to the police.

¶ 44    Pam Burrell, an assistant manager at a local store, testified on behalf of the State. Burrell stated that she was at work in May 2009 when the defendant came into the store with two small children, a boy and a girl. Burrell noticed that the defendant carefully picked up the little boy and placed him in the shopping cart. She also noticed that the defendant was being rough with the little girl when he put her into the cart. Burrell testified that there was hair missing from the little girl's scalp, and there were choke marks on her neck. The little girl's face was red, as if it had been squeezed or slapped. Burrell could see the defendant's face as he was talking to the little girl. She described his eyes as "squinted" with his eyebrows turned downward, and he was clenching his jaws. After the defendant paid for his items, Burrell followed them outside to get shopping carts.

15

While outside, she wrote down the license plate number of the defendant's vehicle and put the paper in her office. Weeks later after seeing Jessika's obituary in the newspaper, Burrell went to the sheriff's department to make a report about what she had witnessed when the defendant came into the store.

¶ 45    The defendant testified on his own behalf. He stated that on June 16, 2009, while they were having dinner, Jessika vomited into her plate. On June 17, 2009, while at the store, Jessika threw up. In the early morning hours of June 18, 2009, Jessika fell in the kitchen. When the defendant went to check on her, she was bleeding on her forehead. The defendant put a Band-Aid on her forehead, and Jessika went back to bed.

¶ 46    The defendant testified that on June 19, 2009, Jessika and Noah were riding on the four-wheeler when he and Brandi saw it tip on its side and threw them to the ground. The defendant stated the four-wheeler was going approximately four or five miles per hour, and that the top speed it could go was six miles per hour. When he and Brandi checked on them, the children said they were okay and continued to ride the four-wheeler. After the four-wheeler ran out of gas, the children came in and had dinner. After dinner, they both fell asleep around 9 or 9:30 on the couch next to the defendant while watching television. Brandi's brother, Stephen, stopped by for a short time. After Stephen left, the defendant testified that he placed Jessika and Noah on the pallet in the bedroom. He went back to the living room to watch television while Brandi cleaned up the kitchen. Approximately 15 minutes later, he heard Brandi talking so he went into the bedroom where he saw Brandi lying on the floor next to Jessika. Brandi told the defendant she was telling Jessika she loved her because she did not have the chance to do so before she fell asleep.

¶ 47    At some point after that, Brandi left to get some drinks from the gas station. The defendant went outside to put the four-wheeler away for the night. He pushed it to the front of the house,

16

beside the house, and used a cable to secure it to the porch. When he attempted to enter the front door of the house, it was locked. He went into the house through the back door. As he was passing by the bedroom, he noticed Jessika was not on the pallet where he had laid her a little while earlier. He found her in the corner of the room having what he thought was a seizure. The defendant testified that Jessika's eyes were open and blank. He picked her up with his left arm and immediately called Brandi and told her to come home. He testified that he laid Jessika on the couch and tried to wake her up. He rubbed and then smacked the bottoms of her feet, attempting to get a response from her.

¶ 48    The defendant estimated that Brandi had been gone approximately four minutes when he found Jessika. When Brandi arrived back home and saw Jessika, she was crying and upset. Brandi called 9-1-1, and the defendant picked Jessika up and moved her to the floor so Brandi could sit next to her. When the EMTs arrived, they immediately took Jessika to the hospital.

¶ 49    Once at the local hospital, the defendant stayed outside with Brandi because she had been told she could not be in the room with Jessika. The defendant denied telling the EMTs that Jessika had gotten into a four-wheeler accident at her father's home in Shawneetown, and he denied doing anything to harm Jessika the night she was injured.

¶ 50    On cross-examination, the defendant admitted that on a telephone call recorded at the jail he called Jessika a "fucking kid" and said, "It's not that I didn't fucking do it, it's just there wasn't —it ain't even a crime." Although the defendant admitted to saying those words, he maintained that the State was taking his words out of context. He explained that he was upset about being arrested for a murder he did not commit. The defendant admitted that after Brandi left to go to the store, he was alone with Jessika and Noah, and that he was the last person to see Jessika before she was injured.

17

¶ 51    Dr. Mary Case, chief medical examiner of St. Louis County, was asked to testify on behalf of the State. Dr. Case is a forensic pathologist and a neuropathologist who has lectured and written about head injuries in adults and children. Jessika's autopsy, which was provided to Dr. Case, was performed by a forensic pathologist. After reviewing the autopsy, autopsy photographs, medical records, police reports, investigative reports, and other records related to Jessika's death, Dr. Case concluded that the cause of death was closed-head injury, meaning the skull was not broken but there was injury internally. She concluded that the manner of death was homicide, meaning that an individual had caused Jessika's death as opposed to it having been caused by an accident, suicide, or by natural or undetermined means.

¶ 52    In reviewing the autopsy, Dr. Case noted that Jessika had a number of findings of trauma to her body including unexplained bruising over the lower portions of both sides of her abdomen which she described as suspicious because it was not a normal place of accidental injury in a child. Dr. Case also noted that Jessika had bruising on the left buttock, left arm, and left leg. According to Dr. Case, Jessika had a very significant injury, a fracture of the right transverse process of the third lumbar vertebrae in the lower portion of her back. Dr. Case described it as "a heavy piece of bone" and would have been a very painful injury. She testified that the fracture was not fresh but had occurred at some point in the past and had been healing.

¶ 53    In reviewing the autopsy photographs, Dr. Case pointed out the injury on Jessika's skull that occurred from an impact. The autopsy revealed subdural and subarachnoid hemorrhages in Jessika's brain. Dr. Case noted that Jessika also had hypoxic brain damage as the result of lack of oxygen. She explained that when Jessika received the injury to her head, she would have been unable to breathe. CT scans revealed bleeding that occurred at the time of Jessika's injury and was part of the injury that caused her death. Dr. Case further explained that Jessika sustained an inertial

18

brain injury which occurs when the head moves very rapidly as the result of impact and the brain separates from the skull. According to Dr. Case, the type of head injury that Jessika received was referred to as traumatic unconsciousness. The doctor explained that when the injury occurred, Jessika would have been immediately unconscious. Dr. Case testified there was no other contributing factor to Jessika's death. The autopsy also revealed that Jessika had retinal hemorrhaging in her eyes, meaning had she survived she would have been blind.

¶ 54    Dr. Case opined, based on a reasonable degree of medical and scientific certainty, that Jessika either had been struck in the head with something or was thrown through the air and struck something, perhaps a wall or a piece of furniture with heavy support. Dr. Case stated that either way, something struck Jessika's head with great force that caused her brain to move very abruptly, causing damage. She further opined that it was not an accident; it was homicide.

¶ 55    During the prosecutor's rebuttal argument, the trial court sustained a defense objection to the following comment by the State: "Dr. Case, who is a world-renowned expert—and by the way, her testimony was not rebutted in any manner. Her testimony stands on its own. [Defense counsel] tried to tear her apart, but he couldn't do it. Why? Because she is an expert, a true expert. Where was their expert?"

¶ 56                                    D. Jury Deliberations

¶ 57    At the close of evidence, after being instructed by the trial court, the jury retired to deliberate. Three hours into the deliberations, at 5:20 p.m., the jury sent a note to the trial court stating it was hung. The State and defense counsel requested a deadlock instruction pursuant to *People v. Prim*, 53 Ill. 2d 62 (1972). Because the trial court believed it was too early in the deliberations, no instruction was provided. At 7:30 p.m., after deliberating in excess of five hours, the jury sent another note to the court stating they were still deadlocked. The trial court denied a

19

defense motion for a mistrial. Defense counsel again requested a deadlock instruction, but the State argued the instruction was premature given that it was a murder trial, Although the timing is not clear from the record, the jury sent a note for the third time informing the trial court that they were still deadlocked. The trial court then summoned the jury into the courtroom and read the deadlock instruction. After returning to the jury room to deliberate further, at 9:26 p.m., the jury reached a verdict finding the defendant guilty of first degree murder in the death of Jessika James. The jury further found that the defendant was over 17 years old and that Jessika was under 12 years old at the time of the offense. After the verdicts were announced, the jury was polled. Each juror was asked, "Were those your verdicts and are they now your verdicts," to which each juror answered "yes."

¶ 58                    E. Posttrial Proceedings

¶ 59    On April 19, 2013, the defendant filed a "Post-Trial Motion" in which he asserted a number of trial court errors; however, the only claim relevant to this appeal was that the trial court erred in denying his motion to continue. At the motion hearing, the defendant maintained that he was prejudiced by his inability to obtain a new expert who could have refuted the State's theory that he had caused the injury to Jessika that led to her death. He further maintained that the State did not prove the mechanism by which this injury had occurred; the only evidence presented at trial was that a brain bleed occurred that evening.

¶ 60    The defendant also filed a motion for a new trial alleging that he was prejudiced by juror misconduct based on information obtained after the verdict was entered. Juror No. 184 contacted defense counsel after the trial to provide details of what happened during jury deliberations, and the defendant attached Juror No. 184's affidavit as an exhibit to his motion. Although Juror No. 184 reported a number of statements allegedly made by jurors, the defendant confines his argument

20

on appeal to the following statement allegedly made by Juror No. 197: "You know that he had pled guilty to this once, don't you!" to which the affiant responded, "I didn't know this, how the fuck did you know this?" The other jurors replied, "Shhhhh!!"

¶ 61 The State countered that the defendant had the burden of showing that he was entitled to an evidentiary hearing on his claim of juror misconduct. The State argued that the defendant's motion for a new trial was merely an attempt to impeach the jury's verdict based on an affidavit from one juror. The trial court took the matter under advisement.

¶ 62                                    E. Sentencing

¶ 63 At the sentencing hearing on August 13, 2013, the trial court sentenced the defendant to a term of natural life imprisonment pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012)). Thereafter, the defendant filed a motion to reconsider sentence, alleging that the subsection of the statute by which the defendant had been sentenced was found unconstitutional by the Illinois Supreme Court. In his motion, the defendant asserted that the sentencing provision had been addressed by the Illinois Supreme Court in *People v. Wooters*, 188 Ill. 2d 500 (1999). The *Wooters* court held that Public Act 89-203, which contained section 5-8-1(a)(1)(c)(ii), violated the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8). *Wooters*, 188 Ill. 2d at 520.

¶ 64 On August 7, 2014, the State and the defendant filed a joint motion to defer ruling on all posttrial motions until the Fifth District Appellate Court had ruled in *People v. Crutchfield*, 2015 IL App (5th) 120371, on the validity of a natural life sentence imposed under section 5-8-1(a)(1)(c)(ii). The motion was granted by the trial court the same day. In its written order, the trial court "defer[red] ruling on all pending post-trial motions in the above-captioned matter until notice

by any of the parties herein that the case of *People v. Crutchfield* [Appellate Court No. 5-12-0371] has been finally decided by the courts of the State of Illinois."

¶ 65    On June 29, 2015, this court issued its opinion in *People v. Crutchfield*, 2015 IL App (5th) 120371. The Illinois Supreme Court denied leave to appeal on September 30, 2015. *People v. Crutchfield*, 39 N.E.3d 1006 (2015) (table). After *Crutchfield* was published, the record does not show any further activity on the instant case until December 17, 2019, when all pending posttrial motions were set for a hearing on January 21, 2020. This was more than four years after the Illinois Supreme Court denied leave to appeal in *Crutchfield*.

¶ 66    On January 12, 2021, a hearing was held on the various pending motions. The parties addressed *Crutchfield* and the fact that in 2016 the General Assembly deleted the section in question. The trial court took the sentencing matter under advisement and gave the defendant until January 14, 2021, to submit legal authorities and gave the State 14 days to respond. The defendant again argued his motion for new trial alleging jury misconduct. The trial court once again took that matter under advisement. The defendant next took up his "catch-all motion" and asked for an additional 21 days to provide additional authority, which the trial court granted. The trial court gave the State 14 days to respond, and then an additional 14 days thereafter for the defendant to respond.

¶ 67    On February 16, 2021, the defendant filed a motion for a new trial, addressing his motion to reconsider, *inter alia*, his sentence, the allegations of jury misconduct, and the denial of an expert witness. In his prayer for relief, the defendant requested that the trial court grant the defendant a new trial or, in the alternative, grant the defendant's motion to reconsider the sentence, and grant an evidentiary hearing on the jury misconduct issue.

22

¶ 68 On January 11, 2022, via docket entry, the trial court denied each of the defendant's posttrial motions. On January 26, 2022, the defendant appealed the trial court's denial of his motion to reconsider sentence, motion for new trial pursuant to section 116-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1 (West 2020)), and posttrial motions filed on April 19, 2013. The defendant urges this court to reverse his conviction and remand for a new trial, or, in the alternative, reverse his conviction and remand for an evidentiary hearing on his claim that jury deliberations were tainted by improper extraneous influences and remand for a new sentencing hearing.

¶ 69                                II. Analysis

¶ 70                          A. Doctrine of *Laches*

¶ 71 At the outset, we address the State's contention that the defendant's claims on appeal are barred by the doctrine of *laches* where the defendant showed a lack of due diligence in seeking a ruling on his posttrial motions. In support of this contention, the State relies on *People v. McClure*, 218 Ill. 2d 375, 389 (2006) (application of *laches* doctrine requires the asserting party to show a lack of due diligence by the opposing party and prejudice to the asserting party). Here, the State failed to establish prejudice where the trial court's order provided that either the State or the defendant was to provide notice after *Crutchfield* had been decided by the courts. Furthermore, *McClure* was a civil case involving a petition filed by a motorist to contest his summary license suspension for refusing chemical testing. The State failed to cite any other authority applying the *laches* doctrine to a defendant in a criminal case. Thus, we find that the defendant's claims are not barred by *laches*.

23

¶ 72                               B. Motion to Continue

¶ 73    On appeal, the defendant asserts he was deprived of the right to present a complete defense when the trial court denied his request for a continuance to obtain a new expert to rebut the State's theory that Jessika had been killed as a result of child abuse.

¶ 74    There is no absolute right to a continuance. *People v. Davenport*, 133 Ill. App. 3d 553, 556 (1985). "It is well settled that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion." *People v. Walker*, 232 Ill. 2d 113, 125 (2009). The supreme court in *Walker* identified several factors that a trial court may consider in determining whether to grant a continuance request by the defendant in a criminal case: the defendant's diligence; the defendant's right to a speedy, fair, and impartial trial; the interests of justice; whether counsel for defendant was unable to prepare for trial because he or she had been held to trial in another cause; the history of the case; the complexity of the matter; the seriousness of the charges; docket management; judicial economy; and inconvenience to the parties and witnesses. *Id.* "There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend." *People v. Lott*, 66 Ill. 2d 290, 297 (1977). "The circumstances of each case must be weighed, particularly the reasons presented to the trial judge at the time the request is denied." *Id.* "A conviction will not be reversed by a reviewing court because of the denial of a continuance, unless the denial resulted in prejudice to the defendant." *People v. Johnson*, 220 Ill. App. 3d 550, 559 (1991). The burden to establish prejudice is on the defendant. *Id.*

¶ 75    Here, the defendant has not established prejudice where he previously sought, and obtained, funds to retain the services of an expert of his choosing. The defendant asserts that he

diligently moved for a continuance when it became clear that Dr. Cantor "was not acting in good faith in relation to the job he was retained to perform." There is, however, no evidence in the record to support the defendant's assertion that Dr. Cantor was not acting in good faith. Rather, the evidence reveals that defense counsel reported to the trial court that Dr. Cantor had "gone south on us." It was the defendant's decision, for whatever reason, not to call Dr. Cantor to testify which left him without an expert witness. The defendant has failed to cite authority to support the proposition that the trial court was required to appoint a second expert witness after he rejected the first expert.

¶ 76    The defendant's argument that a continuance was necessary to allow him time to hire another expert was pure speculation considering that he previously had represented in three separate motions that his family did not have the resources available to hire an expert. Furthermore, the case had been pending for over three years. During that time, one of the State's witnesses had died, and another critical State witness would be retiring soon. If the trial had been delayed, Dr. Case, the chief medical examiner who already had been paid to review many records in preparation for trial, might not have been available at a later date. Thus, we find that the trial court did not abuse its discretion in denying the defendant's motion to continue.

¶ 77                          C. Alleged Juror Misconduct

¶ 78    The defendant next argues that the trial court erred in denying his motion for a new trial without conducting an evidentiary hearing on the allegations of juror misconduct. Specifically, the defendant maintains that Juror No. 197's alleged statement contained in the affidavit that the defendant previously had pled guilty to killing Jessika constituted an improper extraneous influence on the jury. He argues that "this highly prejudicial evidence" undermined his right to the presumption of innocence and constituted reversible error. The State counters that the trial court

25

properly denied the defendant's motion for a new trial because Juror No. 184's affidavit attached as an exhibit to the defendant's motion could not have been admitted at an evidentiary hearing to impeach the jury's verdict.

¶ 79    "[A] trial court may dispose of a motion for a new trial based upon newly discovered evidence without holding a full evidentiary hearing so long as the court's decision is not an abuse of discretion." *People v. Williams*, 2020 IL App (1st) 172118, ¶ 33. A trial court abuses its discretion when its decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court." *Id.*

¶ 80    "As a general rule, a jury verdict may not be impeached by the testimony of the jurors." *People v. Hobley*, 182 Ill. 2d 404, 457 (1998). "It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict." *Id.* The Illinois Supreme Court has explained that "[s]trong public policy considerations underlie this rule, which prevents the admission of a juror's affidavit to show the 'motive, method or process by which the jury reached its verdict.' " *People v. Pitsonbarger*, 205 Ill. 2d 444, 468 (2002) (quoting *People v. Holmes*, 69 Ill. 2d 507, 511 (1978)).

¶ 81    A limited exception to the general rule is found in Illinois Rule of Evidence 606(b):

"(b) Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. *But a juror may testify (1) whether any extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or*

26

*(3) whether there was a mistake in entering the verdict onto the verdict form.* A juror's affidavit or evidence of any statement by the juror may not be received concerning a matter about which the juror would be precluded from testifying." (Emphasis added.) Ill. R. Evid. 606(b) (eff. Jan. 1, 2011).

¶ 82    In *People v. Nitz*, 219 Ill. 2d 400, 421 (2006), the defendant submitted to the trial court evidence of alleged juror bias in the form of a juror's postverdict affidavit to support the defendant's claim that multiple jurors had answered falsely during *voir dire* to questions regarding potential bias or prejudice. The Illinois Supreme Court was asked to consider whether the trial court abused its discretion when it declined to admit the defendant's evidence of alleged juror bias. *Id*. The contents of the juror's affidavit are as follows:

   " 'I, Joan Davis, affiant, affirm and swear as follows:

   1. That I was a juror in the trial of Richard Nitz held in April 1998.

   2. Many of the jurors knew about the case before the trial and at least one juror stated that "he's already been convicted once; how can we let him out". She said this several times during the deliberations as did other jurors.

   3. Many jurors commented on the fact that Richard did not testify and because Mr. Nitz did not testify, he must be guilty.

   4. I was one of four "hold out" jurors because I did not believe that the state proved the case against Richard Nitz. I felt pressured into signing the guilty verdict and did so only because I was told by other jurors that Richard Nitz would be sentenced to time served for the offense if we signed the least culpable verdict form.

5. I was upset that other jurors would consider the other trials, including Richard Nitz'[s] wife's trial results and that they would consider the fact that Mr. Nitz didn't testify.' " *Id.* at 421-22.

¶ 83 The *Nitz* court found that the trial court had not abused its discretion and held that the juror affidavit was inadmissible "because it concern[ed] the jury's motive, method, or process of deliberations." *Id*. at 426. The *Nitz* court was guided by its analysis in *People v. Holmes*, 69 Ill. 2d 507 (1978), a case which thoroughly detailed the principles governing the admissibility of juror affidavits. *Id.* at 424. In *Holmes*, evidence was presented at trial that shoe prints had been left in the snow at the scene of an attempted robbery. *Id*. Without the court's knowledge, several jurors visited a shoe store during the trial to investigate shoe sole patterns. *Id*. Because evidence of the jurors' trip to the shoe store was extraneous, the *Holmes* court found it was admissible. *Id*.

¶ 84 The supreme court in *Nitz* explained that the difference between evidence concerning the jury's motive, method, or process of deliberations and evidence of improper extraneous influence on the jury is that "the former attempts to show the working of the minds of individual jurors, while the latter speaks merely to the extraneous existence of conditions or occurrence of events." *Id*. at 424-26 (citing *Holmes*, 69 Ill. 2d at 511-12). Thus, the *Nitz* court concluded that "juror testimony about extraneous prejudicial information is admissible, while testimony about the effect of that information on the mental processes of jury members would not be admissible." *Id*. at 425.

¶ 85 Here, the affidavit revealed that information was provided to the jury that the defendant previously had pled guilty to killing Jessika. Thus, we find the information provided to the jury in *Nitz* to be similar to that in the instant case. We further find that the trial court did not abuse its discretion in denying the defendant's motion for a new trial without holding an evidentiary hearing

where evidence sought to be introduced by the defendant was juror testimony about the effect of information on the mental processes of jurors, which would not be admissible. *Id.*

¶ 86                                   D. Sentencing

¶ 87    The defendant argues that the mandatory natural life sentence imposed by the trial court pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012)) should be vacated and the cause remanded for resentencing because Public Act 89-203 violated the single-subject rule and has not been reenacted.

¶ 88    A statute that violates the single-subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8) is void, and it is as though the act had never been passed. *People v. Brown*, 225 Ill. 2d 188, 198-99 (2007). In order to revive a provision held to be unconstitutional, the legislature may enact subsequent legislation. *Johnson v. Edgar*, 176 Ill. 2d 499, 522-23 (1997). The newly enacted legislation, however, "must exhibit on its face" evidence that it was intended to cure or validate the defective act. *People v. Reedy*, 186 Ill. 2d 1, 15 (1999).

¶ 89    Section 5-8-1(a)(1)(c)(ii), in existence at the time the defendant was sentenced, mandated a term of natural life for persons 17 years or older who were found guilty of murdering an individual under 12 years of age. This section was enacted under Public Act 89-203, § 40 (eff. July 21, 1995). As this court noted in *Crutchfield*, the mandatory life sentence provision in section 5-8-1(a)(1)(c)(ii) was determined to be unconstitutional and has never been reenacted. *Crutchfield*, 2015 IL App (5th) 120371, ¶ 61.

¶ 90    Contrary to the defendant's argument, the State maintains that the section at issue subsequently was reenacted in Public Act 89-462, art. 2, § 280 (eff. May 29, 1996). Thus, the State argues, section 5-8-1(a)(1)(c)(ii) was validly in effect at the time defendant committed the instant offense. Although the State recognizes that *Crutchfield* found Public Act 89-462 did not cure the

29

single-subject rule infirmity of Public Act 89-203, the State submits that *Crutchfield* was wrongly decided. In support of its position, the State suggests that a recent Illinois Supreme Court case, *People v. Libricz*, 2022 IL 127757, is instructive.

¶ 91     In *Libricz*, the defendant was charged with two counts of predatory criminal sexual assault of a child. *Id.* ¶ 5. The offense of predatory criminal sexual assault was created by Public Act 89-428, with an effective date of December 13, 1995. *Id.* However, Public Act 89-428 was later held unconstitutional in *Johnson v. Edgar*, 176 Ill. 2d 499 (1997), as violating the single-subject clause. The *Libricz* court noted without analysis that the General Assembly's later reenactment of the offense in Public Act 89-462 (eff. May 29, 1996) "had the effect of creating an entirely new criminal statute." *Id.* Thus, the State argues, the new criminal statute created by Public Act 89-462 also included the mandatory life sentencing provision at issue in the instant case. However, we note that the defendant in *Libricz* did not raise a constitutional challenge to the mandatory natural life sentencing provision; rather, the *Libricz* court was asked to consider the defendant's challenge to the sufficiency of the charging instrument. *Id.* ¶ 36. Moreover, the *Libricz* court did not mention, much less address, our decision in *Crutchfield* or the supreme court's decision in *Wooters*. Thus, we do not find *Libricz* instructive nor do we find that *Crutchfield* was wrongly decided. Therefore, the trial court was in error when it imposed a sentence of natural life pursuant to 5-8-1(a)(1)(c)(ii).

¶ 92                                        III. Conclusion

¶ 93     For the foregoing reasons, we affirm the defendant's conviction of first degree murder. We vacate the defendant's sentence and remand the cause to the trial court with directions to impose a sentence within the appropriate sentencing range.

¶ 94     Affirmed in part and vacated in part; cause remanded with directions.