2025 IL App (1st) 231593-U
Order filed: July 17, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1593

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12CR20656 |
| | ) | |
| MALCOLM LOGAN, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's order denying the defendant's motion for a new trial based on ineffective assistance of counsel after a *Krankel* hearing is vacated and remanded. The trial court denied the defendant due process by using its personal knowledge of trial counsel to evaluate the credibility of testimony at the hearing.

¶ 2    Following a bench trial, the defendant, Malcolm Logan, was convicted of first-degree murder and two counts of attempt murder. On direct appeal, this court affirmed the defendant's convictions, but remanded for a hearing on the defendant's *pro* se allegations of ineffective assistance of counsel. *People v. Logan*, 2018 IL App (1st) 153552-U, ¶ 42. The defendant now appeals the denial of his motion for a new trial based on the ineffective assistance of counsel after

an evidentiary hearing. For the reasons which follow, we vacate the trial court's order and remand for a new *Krankel* hearing.

¶ 3    In November of 2012, the defendant was charged by indictment with, *inter alia*, 42 counts of first-degree murder and eight counts of attempt first-degree murder arising from a shooting that occurred in Chicago on April 12, 2012, which resulted in the death of Lamont Coleman. The defendant elected to have a bench trial, where he was represented by William P. Murphy as private counsel, along with his associate Kathleen Schultz. Before trial, the trial court admonished the defendant regarding his right to a jury trial, and the defendant signed a jury waiver.

¶ 4    The evidence at trial was previously set forth in our order on the defendant's direct appeal. *Logan*, 2018 IL App (1st) 153552-U, ¶¶ 4-13. William Bradshaw, Coleman's cousin, testified that, at approximately 7 p.m. on April 12, 2012, he drove Coleman and Fred Thompson to a liquor store at 115th Street and Halsted in Chicago. They entered the store followed by four men, including the defendant, who was known to Bradshaw as "Little C". Bradshaw had seen Little C around the neighborhood and identified him in court as the defendant. Bradshaw left the store with Coleman and Thompson, closely followed by the defendant and the other men. He entered the driver's seat of his Jeep, with Coleman in the front passenger seat and Thompson in back. The defendant and the other men entered a Grand Prix parked next to the Jeep, with the defendant entering the driver's seat. Bradshaw had previously seen the defendant driving the Grand Prix around the neighborhood.

¶ 5    Bradshaw drove east on 115th Street with the defendant following closely behind him in the Grand Prix. At a stop sign at 115th Street and Lowe Avenue, the defendant drove alongside the passenger side of the Jeep and started shooting at the Jeep. Bradshaw ducked and tried to drive away, but could not restart his vehicle. He heard seven or eight shots and was struck by a bullet in his elbow, and Coleman "holler[ed]" that he was shot. Bradshaw drove to Roseland Hospital,

where he treated for his injury and learned that Coleman had died. He told the police what happened and, on April 24, 2012, identified the defendant in a photograph array. On October 6, 2012, he went to a police station and identified the defendant in a lineup. Bradshaw identified the defendant in surveillance video from both inside and outside of the liquor store.

¶ 6 Thompson testified that he left the liquor store with Coleman and Bradshaw who drove east on 115th Street and stopped behind another vehicle at a stop sign. Thompson then heard gunfire and was grazed by a bullet on the right side of his head. He ducked and heard another 15 or 16 shots coming toward the passenger side of the Jeep, but did know where the shooter fired from. On cross-examination, he stated that the shots were fired from "behind" because he was "[l]ooking straight ahead" and his graze wound went "from back to front."

¶ 7 Detective Donald Hall testified that, on April 12, 2012, he spoke with Bradshaw at Roseland Hospital. Afterwards, he directed police officers to 115th Street and Lowe Avenue and began looking for Little C. On April 24, 2012, after learning from Bradshaw that Little C was the shooter, he assembled a photo array, where Bradshaw identified the defendant as the shooter. Detective Hall then issued an investigative alert for the defendant's arrest. Detective Alejandro Almazan testified that, on October 5, 2012, following the defendant's arrest, he arranged a lineup at the Area South police station, where Bradshaw identified the defendant.

¶ 8 The State entered into evidence the stipulated testimony of an evidence technician who recovered bullet fragments from Bradshaw's Jeep and six spent shell casings on 115th Street. The State also entered into evidence the report and stipulated testimony of the assistant medical examiner who determined that Coleman died from multiple gunshot wounds.

¶ 9 The State rested and the defendant rested without presenting evidence. Following closing arguments, the trial court found the defendant guilty of all counts. The court noted that the case

did not involve "a split second identification by a witness who doesn't know the offender," and that the testimony of Bradshaw, who "had seen the [d]efendant and his car on multiple occasions," was "highly credible," and "knows exactly [what] he saw."

¶ 10 After the verdict but before sentencing, Schultz requested that the trial court conduct an inquiry into the defendant's fitness for sentencing due to the defendant's suicide attempt while at Cook County Jail. The trial court held a fitness hearing on June 17, 2015, and the defendant was found fit for sentencing.

¶ 11 On October 13, 2015, the defendant filed a *pro se* motion alleging that his attorneys were ineffective for refusing his "request[s]" to (1) file a "motion for identification because the State's witness alleged that the offender was 6 feet 2 inches;" (2) file a "motion for the investigative alert because he was arrested without a warrant;" (3) hire or subpoena a forensic specialist, crime scene technician, or medical examiner; (4) visit him in jail to discuss strategy instead of sending an assistant one day prior to trial; or (5) send an investigator to "investigate" the State's witnesses and "contact potential witnesses." Additionally, the defendant alleged that his attorneys failed to timely communicate with him, did not adequately prepare for trial, and that their "performance and strategy was [sic] very poor," particularly in "questioning witnesses and remembering incident dates." He requested that the court "hold a hearing," find that counsel was ineffective, "appoint a new private counsel," and grant a new trial.

¶ 12 On October 29, 2015, the trial court noted that, in his *pro se* motion, the defendant made allegations regarding his attorneys' performance. The court stated, however, that due to the fitness inquiry, posttrial proceedings had lasted more than one year and, "[a]t this late hour," the defendant's motion was "disingenuous" and "dilatory." The court denied the defendant's posttrial motion and proceeded to a sentencing hearing, where it imposed a sentence of 45 years'

imprisonment for first-degree murder, to run consecutively to concurrent sentences of 31 years' imprisonment on two counts of attempted first-degree murder.

¶ 13    On direct appeal, the defendant raised five claims of error, including that the trial court failed to conduct a preliminary inquiry into his *pro se* allegations of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). *Logan*, 2018 IL App (1st) 153552-U, ¶ 2. This court affirmed the defendant's convictions, reduced his sentence as to the attempt murder of Thompson, corrected the mittimus, and remanded for the limited purpose of allowing the trial court to conduct a *Krankel* hearing regarding the defendant's *pro se* allegations of ineffective assistance raised on October 13, 2015. *Id.* ¶ 42.

¶ 14    On remand, the trial court appointed new counsel for the defendant for *Krankel* proceedings. The defendant filed supplemental motions to vacate his conviction and for a new trial on February 9, 2023, and April 14, 2023, raising additional arguments that (1) the defendant's mental health problems at the time of trial prevented a "true meeting of the mind, as to the issue of his jury waiver", (2) Murphy failed to impeach Bradshaw with a prior videotaped statement, and (3) Murphy failed to investigate a witness who made a statement to police.

¶ 15    The trial court held an evidentiary hearing over three court dates on May 3, 2023, May 23, 2023, and July 20, 2023. The defendant testified that he hired Murphy as his trial counsel. He stated that Schultz visited him at the jail and provided him with police reports describing an individual wearing a white hat that was seen leaving the crime scene. He testified that Schultz told him that they would investigate and talk to that person, but Murphy later told him that they did not need that individual as a witness. The defendant stated that Murphy suggested that he take a bench trial because Murphy knew and had a relationship with the trial judge. The defendant testified that he waived his right to a jury trial because he believed that Murphy would have an influence over

the trial judge. He stated that he asked Murphy to file a motion to suppress Bradshaw's identification, but Murphy told him that "we'll handle everything at trial". He testified that he also asked Murphy to challenge his arrest based on an investigative alert, but Murphy did not do so.

¶ 16   On cross-examination, the defendant stated that, in 2013, he asked Murphy or Schultz to investigate the individual named in the police report. He stated that Murphy did not explain what a jury trial was, but told him that a bench trial was the best thing to do, and said that "we're going to win". He testified that he thought that Murphy "had my best interest" and that he never questioned Murphy regarding a bench trial and "just went with what he told me."

¶ 17   Murphy testified for the State. He stated that he was "sure" that he and the defendant "talked several times" about the defendant's decision to have a bench trial or jury trial. Murphy testified that he informed the defendant that it was his (the defendant's) decision to have a bench trial or a jury trial, but he advised the defendant to take a bench trial. He stated that he did not promise the defendant that he would be found not guilty at a bench trial.

¶ 18   On cross-examination, Murphy stated that he spoke with the defendant about the facts of the case, but was not sure if he was aware of the individual in the white hat seen running away from the scene. He acknowledged that a police canvass report admitted at trial included a name and address for an individual named Marques Buford, but did not recall any efforts to locate that witness. He did not remember if Schultz recommended sending an investigator to the neighborhood to try to locate the witness. Murphy stated that, when discussing the decision to have a bench or jury trial with the defendant, he probably talked to the defendant about the trial judge overseeing his case. He testified that he knew the trial judge since the judge was a state's attorney. He denied telling the defendant that he knew how the trial judge felt about "single-finger" identification cases or saying that the trial judge would find the defendant not guilty. He stated that

he may have told the defendant that this type of case would be a not guilty in recommending a bench trial. On redirect examination, Murphy stated that, if he had information that there was another shooter, he would have investigated it.

¶ 19    On July 5, 2023, the defendant filed an amended supplemental motion to vacate the finding of guilty, adding claims that Murphy was ineffective for (1) failing to investigate certain witnesses, (2) stipulating to the medical examiner's testimony against the defendant's wishes and failing to examine the medical examiner regarding the trajectory of bullets, (3) failing to object to inconsistent statements by Bradshaw regarding the location of the crime scene and his description of the shooter, and (4) failing to adequately bring out the fact that the shell casings found at the scene did not match the bullets found in the victim.

¶ 20    Schultz testified for the defendant in rebuttal. She stated that she interviewed the defendant multiple times without Murphy present. She recalled that police reports referred to a man in a white shirt or hat running from the scene and that she suggested to Murphy that they should locate that individual. She did not know if Murphy sent an investigator, but she never saw an investigation report regarding that person in their file.

¶ 21    The defendant was recalled in rebuttal. He testified that he asked Murphy to file an "identification motion", among other pretrial motions. He stated that, while in jail, other inmates suggested that he take a jury trial, but Murphy told him that the outcome at a bench trial was a "sure thing" and that they would win the case. He testified that Murphy told him that he knew the trial judge, who was "a good judge", and not to worry because they would win the case.

¶ 22    After hearing arguments from the parties and continuing the matter to review transcripts from the hearing and from trial, the trial court issued its decision on August 14, 2023. The trial

court started its oral ruling by noting that, based on this court's mandate, his duty was to evaluate trial counsel's performance from "his judicial perspective". The court then stated the following:

"I have known Bill Murphy for about 40 years as both an Assistant State's Attorney. I opposed him on various case. As a judge I have had him before on a number of cases.

We both practice law during what is known as the Greylord era in this courtroom. A tainted room back in 1977. We both understood at the time and we understand now the implications of guaranteeing an outcome.

I know that Bill Murphy testified truthfully when he said that he never promised a not guilty based on a close relationship with the judge.

I do not believe the defendant when he said that Murphy promised a not guilty.

Anyone that practice law and lives through the Greylord era knows exactly what the words a guarantee means of not guilty. That means that that judge was bought and paid for and that's what the implication of a not guilty guarantee.

The defendant claimed that Murphy said that because of the close relationship that he had with me. It wasn't a close relationship. We knew each other and we had a professional relationship. We didn't have any kind of close relationship. We were both White Sox fans, but we didn't go to White Sox games together. We weren't close. We knew each other professionally.

Bill Murphy has tremendous credibility on the issue of whether he guaranteed a not guilty.

And the defendant has zero credibility on his statement that Murphy guaranteed a not guilty."

¶ 23    The trial court found that Murphy's advice to the defendant to take a bench trial in a "single-finger" identification case was responsible trial strategy. The court found that attacking Bradshaw's identification was the only defense in the case and that Murphy's trial strategy was "flawless". The court observed that, based on the transcript, the defendant executed a jury waiver prior to trial and answered in the affirmative when asked by the court whether he made the decision of his own free will. The court found that Murphy was not ineffective for failing to locate the man in the white hat as a police canvass was unable to identify the individual that Buford stated he saw walking away from the scene. The court concluded that the defendant failed to meet his burden to show the ineffective assistance of counsel, and denied the defendant's motion for a new trial. This appeal follows.

¶ 24    On appeal, the defendant argues that the trial court erred in denying his motion for a new trial because the evidence at the *Krankel* hearing established that Murphy was ineffective for (1) failing to investigate an eyewitness for which they had a name and address, (2) failing to move to suppress the pre-trial identifications by Bradshaw as unlawfully suggestive, and (3) coercing him into waiving a jury trial by assuring a not guilty finding based on Murphy's relationship with the trial judge. The defendant also argues that he was deprived of due process when the trial court relied on its personal knowledge of Murphy when denying his motion for a new trial.

¶ 25    A criminal defendant has a constitutional right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). After trial, a defendant may raise ineffective assistance of counsel claims *pro se*. *Krankel*, 102 Ill. 2d at 187-89. If those contentions are determined to have merit, the trial court must appoint new counsel to pursue the defendant's claims at an evidentiary hearing. *People v. Jackson*, 2020 IL 124112, ¶ 97.

¶ 26    We first address the defendant's argument that his due process rights were violated when the trial court relied on its personal knowledge of Murphy in denying his motion. The State argues that the defendant forfeited this claim by failing to object at the hearing or raise the issue in a post-hearing motion, and that the defendant failed to establish any error occurred. We agree with the defendant.

¶ 27    A ruling based on information outside of the record constitutes a due process violation and is reversible error. *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001). A court acting as a finder of fact may not consider information outside of the record when determining witness credibility. *People v. Harris*, 2021 IL App (1st) 182172, ¶ 54. However, a judge sitting as a trier of fact is permitted to take his own life and experience into account in ruling on the evidence. *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007). We review whether the defendant's due process rights were violated *de novo*. *People v. Guzman*, 2015 IL 118749, ¶ 13.

¶ 28    The defendant acknowledges that he failed to object to the trial court's statements, but argues that we can review the issue as plain error, or alternatively that *Krankel* counsel was ineffective for failing to object to the court's statements. Plain error review allows a reviewing court to consider errors that are not properly preserved in two circumstances: (1) the evidence is closely balanced, or (2) the errors are of such magnitude that the accused was denied a fair and impartial trial. *Jackson*, 2020 IL 124112, ¶ 81. The first step when considering the plain error doctrine is to consider whether any error occurred. *Id.*

¶ 29    In arguing that the trial court erred by relying on its prior experience with Murphy, the defendant relies upon *People v. Steidl*, 177 Ill. 2d 239 (1997). In *Steidl*, the defendant raised a claim of ineffective assistance of counsel in a postconviction petition. *Id.* at 265. The trial court denied the petition, noting that it was familiar with trial counsel and recalled multiple cases where

trial counsel had secured not guilty verdicts. *Id.* at 265-66. Our supreme court held that the statements of the trial judge indicated that he relied on his personal knowledge of trial counsel's performance in previous cases to determine counsel's competency in the case before him, reversed the dismissal of the defendant's postconviction petition, remanded the case to circuit court for an evidentiary hearing, and held that on remand the trial judge should be recused from considering the defendant's ineffective assistance claims. *Id.* at 266.

¶ 30 Here, similarly to *Steidl*, the record shows that the trial court relied on its personal knowledge of Murphy in assessing the credibility of Murphy's testimony. The trial court relied on its shared experience with Murphy during the "Greylord era" to support its conclusion that Murphy would not have promised the defendant that he would be found not guilty in a bench trial. The trial court's statements that "I know Bill Murphy testified truthfully" and "Bill Murphy has tremendous credibility" in this context suggest that it found Murphy's testimony more credible based on its personal knowledge of Murphy as an attorney. We find that the trial court committed error by relying on information outside the record in assessing the credibility of the testimony at the *Krankel* hearing.

¶ 31 The State argues that, even if error occurred, the defendant failed to show that he was prejudiced or that he is entitled to relief under the plain error doctrine. We find that the defendant has met his burden under the first prong of plain error, as the evidence at the *Krankel* hearing was closely balanced. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The resolution of the defendant's ineffective assistance claims required resolving conflicting testimony by the defendant and Murphy, particularly on the issue of whether the defendant was told to take a bench trial or was promised a not guilty finding at a bench trial. We find that the trial court's use of its personal knowledge of Murphy to support his credibility undermined the fairness of the *Krankel* hearing

and prejudiced the defendant. See *Steidl*, 177 Ill. 2d at 266 (consideration of information outside the record is prejudicial error). Therefore, we vacate the trial court's order denying the defendant's motion for a new trial and remand for a new *Krankel* hearing before a different judge. See *id.* at 266.

¶ 32    Since we are vacating the trial court's order and remanding the case for a new *Krankel* hearing, we need not address the other issues raised by the defendant in this appeal.

¶ 33    Vacated and remanded with directions.